**ANTILLES SHIPPING CO., Ltd., as Owner of SS PACHEMIST, Plaintiff,**

v.

**TEXACO, INC., Defendant.**

**No. 65 AD. 619.**

United States District Court, S. D. New York.

Sept. 23, 1970.

Kirlin, Campbell & Keating, New York City, for plaintiff, Edward L. Smith, New York City, of counsel.

Warner Pyne, New York City, for defendant, Stephen J. Buckley, Foley & Martin, New York City, of counsel.

### OPINION

COOPER, District Judge.

This is an admiralty action brought by plaintiff Antilles Shipping Co. Ltd. (Antilles) against defendant Texaco, Inc. (Texaco) to recover damages sustained as a result of the alleged breakdowns of the thrust bearings and rotor journals of plaintiff's tanker T/V Pachemist, first in December, 1963 and then again in January, 1964, on the ground that they were caused by the unsuitability of the vessel's lubricating oil, Regal Oil 500 E.P., manufactured and recommended by Texaco for use in the lubrication system of the Pachemist.

Plaintiff claims breach of warranty and negligence as the bases of defendant's liability: breach of warranty because the oil was allegedly not fit for the use to which it was put and for which Texaco had recommended it, thus sustaining damages by reason of unsuitability; negligence because Texaco marketed and recommended use of the oil as a lubricant for the Pachemist after it should have known of the oil's alleged unsuitability therefor.

At the outset of trial it was agreed that the issue of liability should be tried and determined first and the issue of damages await the Court's disposition thereon. The issue of liability was tried before this Court on April 1, 2, 3, 1970, at the conclusion of which decision was reserved. This opinion constitutes our findings of fact and conclusions of law on the issues presented, pursuant to Rule 52, F.R.Civ.P.

At the outset, defendant "admits the sale of the product to plaintiff, and also admits that it warranted the product to be suitable for use on the T/V Pachemist." Defendant's Post Trial Brief, May 11, 1970, p. 1. The parties

acknowledge that the only issues remaining in dispute are the factual questions of unsuitability of the product and causation. *Id.*; Plaintiff's Reply Brief, May 18, 1970, p. 1. Plaintiff has the burden of establishing each of these elements by a preponderance of credible proof. Thus, plaintiff must show that the oil in question was not fit for the purpose of lubricating the engine and shaft bearings of the ship and that damages were suffered as a result of its unsuitability. In this regard, plaintiff must show that it used the product properly. See, *e. g.*, Peragine v. Esposito, 17 Misc.2d 621, 184 N.Y.S.2d 25, aff'd 8 A.D.2d 710, 185 N.Y.S.2d 750 (1st Dept. 1959).

■ With respect to plaintiff's burden of proving causality, it may not recover for breach of warranty if the essential cause of the occurrences here in question were other than the alleged unsuitability of the oil. See, *e. g.*, Natale v. Pepsi-Cola Co., 7 A.D.2d 282, 284, 182 N.Y.S.2d 404 (1st Dept. 1959). Moreover, "[w]here the facts proven show that there are several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of one cause as the other, plaintiff cannot have a recovery, since he has failed to prove that the negligence [or breach of warranty] caused the injury." Ingersoll v. Liberty Bank of Buffalo, 278 N.Y. 1, 7, 14 N.E. 2d 828, 829–830 (1938); Schwartz v. Macrose Lumber & Trim Co., Inc., 29 A.D.2d 781, 287 N.Y.S.2d 706 (2d Dept. 1968), aff'd, 24 N.Y.2d 856, 301 N.Y.S. 2d 91, 248 N.E.2d 920 (1969).

We now turn to analyze the two incidents of damage to the Pachemist which are the subject of this complaint and plaintiff's contentions as to the factors which made defendant's oil unsuitable and induced damages.

*Facts*

The Pachemist was purchased by Antilles from Texaco in early 1963. Tr.[1]

10, 11. The ship was overhauled and converted into a chemical carrier by Antilles in Germany. Tr. 11, 12, 15. In the course of overhaul it was necessary to enter the turbine power plant. As a result, the oil from the lubricating system was pumped out into drums and tanks on shore. Tr. 20. The oil in the vessel was the same Texaco Regal Oil 500 E.P. in issue, an oil containing a chlorine additive. A representative of Westinghouse, manufacturer of the turbine, was present *during overhaul*. He reported on June 16, 1963, as follows:

"Gears and housing very dirty. Removed all pieces of shims. This condition was witnessed by Mr. Holman. Recommended removing all piping for cleaning and cleaning out housing. Mr. Holman said to remove only pipe necessary to do job."

Plaintiff's exhibit 3 in evidence.

Mr. Holman was plaintiff's representative who supervised all of the conversion work on the Pachemist. Tr. 61. He acknowledged that this report was accurate and that only some, (emphatically not all) of the lubricating system's piping was removed. Tr. 93–94. See Tr. 158–160. The Pachemist's Chief Engineer Witte testified that cleaning of that piping was accomplished ashore by chemical bath followed by steam lancing. Tr. 112. The pipes were then plugged. Tr. 113. The various tanks of the lubricating system were cleaned with rags. Tr. 66, 113. At the time of reassembly any pipes which had come unsealed were blown out with compressed air to remove foreign matter. Tr. 118.

Upon Texaco's finding (through its European affiliate Caltex) after analysis of samples that the oil removed from the vessel was fit for further use, and Texaco's recommendation of the continued use by Antilles of Texaco's Regal Oil 500 E.P. in the Pachemist, the oil stored ashore was returned to the ship's lubricating system after reassembly was completed, together with new amounts of such oil purchased from Texaco to re-

1. "Tr." followed by a number refers to pages in the trial transcript.

place not alone that portion of the old which had been found unfit but also an additional quantity lost because of an open valve. Plaintiff's exhibit 6 in evidence; Tr. 63–67; Tr. 20, 22, 23. No flushing oil was used to clean the system before returning the lubricating oil. Tr. 157.

Following recommissioning the vessel was delivered to plaintiff's crew. Tr. 25. In September, 1963 she sailed to the United States, taking on cargo at various Gulf ports, passed through the Panama Canal and proceeded to San Francisco. Tr. 28, 29. Samples of the lubricating oil were taken on October 16, 1963 in San Francisco and analyzed by Texaco. Tr. 29. Texaco found that the oil was in good condition and fit for further use. Plaintiff's exhibit 12 in evidence; Tr. 29, 30. On September 17, 1963 the Pachemist set sail from San Francisco bound for Japan. High seas which strained the vessel were immediately encountered upon departure and continued throughout the voyage. Plaintiff's exhibit 14 in evidence, pp. 4, 5. On October 30, 1963 the ship sustained structural damage from the heavy weather. Id. at 2–5, 7 and 8. Similar weather was encountered during September, November, and December, 1963 as well. Id. at 2, 14.

In early November, 1963, the ship discharged her cargo in various Japanese ports. She departed Japan November 11, 1963. On December 1, 1963 as she neared the Panama Canal trouble with the turbine thrust bearing was noted. Id. at 5. Temporary repairs were made then and again on December 7 and 8, 1963. Id. at 5–6. The vessel then proceeded through the Canal to Todd Shipyard, Galveston, Texas for permanent repairs to her turbine and also to the heavy weather structural damage. Id.

These repairs were made between December 12 and 23, 1963 under the supervision of the American Bureau of Shipping, Salvage Association, London, United States Salvage Association and plaintiff's representative Mr. Holman.

Plaintiff's exhibits 13, 14, 14A–F in evidence; Defendant's exhibit B in evidence. Westinghouse also sent a representative. Defendant's exhibit A in evidence. Plaintiff submitted a claim for insurance based on crew negligence against the underwriters. It was determined that the damage to the turbine did result from a loss of lubrication due to crew negligence. Plaintiff's exhibits 14 at 2–3 and 14 E–F; Defendant's exhibits A and B; Tr. 79, 102–103. On the basis of this finding by the surveyors present during repairs and supported by the insurance adjuster, plaintiff's claim was honored and paid by the underwriters. Tr. 51, 52.

The Westinghouse report on damages to the Pachemist noted in part:

"Customer's oil system was very dirty, it is apparent that the oil was 'lost' at one time."

Defendant's Exhibit A, p. 4.

The surveyors made note of the contaminated state of the lubrication system (metal and grit) after this first breakdown and recommended it be opened, thoroughly cleaned and closed in good order. Plaintiff's Exhibit 14, pp. 11, 15; Defendant's Exhibit B. A report by the surveyor for the American Bureau of Shipping dated December 21, 1963 stated that "sump and gravity tanks were opened and cleaned, lines flushed clear and system left in good clean condition." Plaintiff's exhibit 13. No flushing oil was used in cleaning, however. Tr. 157, 158. The vessel's lubricating oil was not changed at Galveston; plaintiff continued to use defendant's Regal Oil 500 E.P. Chief Engineer Witte deposed that this oil was clean before the ship left Todd Shipyard because it was purified before it was returned to the sump tank. Tr. 165.

On December 22, 1963, the vessel left Todd Shipyard and after taking on cargo headed again for Japan. Tr. 35, 36. Prior to reaching Hawaii, on January 13, 1964, trouble again developed, this time involving the high pressure turbine bearing. Plaintiff's exhibit 17 in evi-

dence, p. 5; Tr. 79, 80. The Pachemist proceeded to Honolulu, arriving January 20, 1964, where repairs were made from January 21 to January 28 under the supervision of the American Bureau of Shipping, Salvage Association, London, and United States Salvage Association. Plaintiff's exhibits 18 and 19 in evidence; plaintiff's exhibit 17, pp. 6–9 and 9–12. Plaintiff's representative Holman was present, as was a representative from Westinghouse. Tr. 90; Plaintiff's exhibit 16 in evidence.

With regard to the lubricating system and defendant's oil used therein, the surveyors decided to have the oil tested for possible contamination. Plaintiff's exhibit 17. Elementary analysis was performed by Hawaiian Laboratories, Inc., an independent local laboratory, as well as defendant supplier Texaco. *Id.* at 8, 11, 13. The results of these tests disclosed trace amounts of suspended material and defendant found the oil "suitable for further service." Plaintiff's exhibit 17, pp. 8, 13; plaintiff's exhibit 15 in evidence. The ship's strainer in the lubricating system was found to contain a large deposit (we deal with this later).

A more detailed lube oil analysis was ordered "to determine possible relation of oil constituents to damages dealt with." Plaintiff's exhibit 17, p. 9. Texaco performed a further analysis. Portions of the bearings and thrust collar and samples of the centrifuge and oil screen deposits were submitted. Upon analysis (covered in a report dated February 12, 1964) the oil screen deposit was found to consist of 18% oil and 82% residue; welding beads, metal fragments, sand, glass, fibrous materials, paint flakes, woodchips and rust made up this residue. Defendant's exhibit D in evidence; plaintiff's exhibit 25.

Plaintiff decided to change lubricating oils. After the entire system was pumped out, it was first flushed for ten hours with 1500 gallons of flushing oil and then recharged with a non-chlorinated lubricating oil. Plaintiff's exhibit 17, pp. 8, 11.

Following completion of repairs, the Pachemist apparently remained in service without further incident from January 30, 1964 until her lay-up in October, 1964. Tr. 43.

Thereafter, in a report dated March 29, 1968 the insurance adjuster reported that this damage "might have been caused by the use, on the supplier's recommendation, of a type of lubricating oil unsuited for the machinery in question" and recommended commencement of the present lawsuit. Plaintiff's exhibit 17, pp. 2–3.

### Plaintiff's Argument

Plaintiff's contention is that Texaco's Regal Oil 500 E.P. is unsuitable for use in a ship's lubricating system because of its chlorine-based additive which, though useful for certain purposes, contributes to the machining or cutting of grooves into the rotating steel bearing surfaces thereby causing their failure.

Specifically, plaintiff alleges that some small abrasive particles are unavoidably present in the lubricating system despite filters and oil purifiers which were built into the Pachemist's system; that in a non-chlorinated oil these small hard particles would ordinarily be destroyed or be completely embedded in the soft babbitt surface before gross damage of the sort present here was done to the bearings; that with a chlorinated oil such as this complete embedment is resisted and the particles may protrude from the babbitt; that, in any event, the chlorine additive makes the oil a cutting oil which inhibits excessive heating of steel surfaces during abrasion; that, accordingly, the hard particles are not softened or destroyed and can become a cutting tool; that some of the chlorine and iron unite to form iron chloride; that the debris abraded by the particles from the bearing is transformed into hardened steel and cooled by the chloride; that the debris thus becomes additional cutting tools; that this process is therefore a progressive one producing gross damage and machined surfaces; that the cooling

property of the chloride formed not only prevents destruction or softening of the particles which would render them relatively harmless, but because of the absence of excessive heating prevents early detection of the destruction as well. Tr. 168–237.

As a result, plaintiff claims that the presence of particles in amounts which would cause only light damage at most in non-chlorinated oil can cause gross damage of the sort present in both instances here where a chlorinated oil was used. The identifiable and distinguishing physical characteristic of chlorine-produced failures is said to be "gross failure" or the occurrence of machining or grooving of the hard steel rotor surface before the softer babbitt surface is destroyed. Tr. 171–176, 183–184, 188–189.

This argument as to the unsuitability of defendant's oil for the use to which it was intended rests solely upon the testimony of Sidney Karpe, a chemical engineer for the United States Navy, who duplicated the type of failure described above under laboratory conditions wherein use was made of a fixed probe of tungsten carbide to score rotor journals made of low chrome steel. Gross failure with accompanying machining of the hard steel surface did not occur in testing under the same conditions when a non-chlorine oil was substituted. Tr. 218–222. Mr. Karpe's testimony then dealt with his explanation, as set forth in summary above, for the difference in results obtained when a chlorine-based lubricant is used.

### December 1963 Failure

As already noted in the factual recital above, investigation on the scene and at the time of the repair work at Galveston resulted in a claim by plaintiff, supported by the determination of the surveyors present, and accepted by the adjuster and ultimately by the underwriters, that this failure and consequent damage resulted from a loss of lubrication due to negligence by the ship's crew. Plaintiff recovered insurance for the damages sustained based on this finding of negligence.

The London Salvage surveyor reported:

In the opinion of the Undersigned Acting Surveyor the damage to the turbine bearings and thrusts, and the high speed pinion bearings was the result of an interruption in the flow of lubricating oil to the engine with consequent damage to the turbine rotors and internal parts.

The interruption of oilflow must have been of short duration since the lower speed bearings were not affected. Although no log entries were noted in this connection, the lubrication loss might have been the result of any of the following:

Lubricating oil pump failure, fouling and complete stoppage of the lubricating oil system strainers, or improper operation of the lube oil system valves by the ship's crew.

In any of these possible events, the lubricating oil system alarms should have given sufficient warning to secure the engine and prevent damage.

Plaintiff's exhibit 14E–F.

Plaintiff's representative Holman supervised the repairs at the Todd Shipyard. He, as well as the surveyors, signed a field survey report prepared by the Shipyard in which damages were alleged to have been sustained due to loss of lubrication. Defendant's exhibit B. Holman had discussed the incident with Chief Engineer Witte. Tr. 102. As to Witte and the absence of any notation of loss of lubrication in the log book, Holman stated, "No, he wouldn't—he wouldn't admit it if it was so." Tr. 103.

The adjuster's report prepared after the investigation for submission to the underwriters states:

The adjusters have also discussed the cause of this damage with the

Vessel Owners and the conclusion has been reached that it is reasonable to assume that the damage is attributable to negligence of the crew having inadvertently closed a valve in the lubricating oil system which stopped the oil feed to the affected bearings.

It is also reasonable to assume that, in view of the nature of the damage, the negligent act could not have occurred less than three or four days prior to discovery of the damage on December 1st, 1963.

Plaintiff's exhibit 14, p. 3.

This report by plaintiff's adjuster, ascribing crew negligence as the cause of the first breakdown, was dated August 10, 1964, seven months after the second breakdown had occurred.

Plaintiff's own expert witness Karpe when asked whether the first breakdown was of a "machining" type such as he testified chlorine additives might permit stated that "it could have been * * *, but definitively I could not say it was." Tr. 199, 200. See Tr. 222–223. Thus, he responded to direct examination by plaintiff's counsel:

Q   On balance what is your opinion?

A   On balance I would not like to associate both failures.

Tr. 200.

The physical damages suffered in the first breakdown had been too extensive, Karpe testified, to permit a firm conclusion that the failure was of the "machining" type and caused by the chlorine additive. Tr. 199, 200, 222–223.

After certain equivocation, Karpe testified that in his opinion this first failure was probably of the "machining" type; he based that conclusion however on two premises undercut by other evidence: (1) a supposed lack of overheating and (2) an assumption, in the absence of photographs, that the condition which existed after the first failure was the same as the condition shown on the photographs (plaintiff's exhibits 22, 23 and 24 in evidence) relating to the second breakdown. Tr. 223.

As to the first assumption that there was an absence of temperature rise: aside from the fact this proposition rests upon the credibility of Witte's log book, already discredited by plaintiff's representative Holman, there were affirmative statements by the surveyors that evidence of overheating was in fact present. Plaintiff's exhibit 13, items 1 and 6; plaintiff's exhibit 14, p. 9, item 1.

Regarding the second assumption that the physical condition after the failures appeared the same, Chief Engineer Witte who was on board the Pachemist during the first breakdown, when shown these same photographs (plaintiff's exhibits 22, 23 and 24) of the damaged condition after the second breakdown, testified that none of those photographs reflected the condition he had found after the first. Tr. 156.

■ As we see it, plaintiff has failed in his burden of establishing by credible and convincing proof that defendant's oil, specifically its chlorine additive, was responsible for the damages suffered in December of 1963. The conclusion of the on-the-scene investigators, including plaintiff's own representative, that loss of lubrication due to crew negligence caused this damage is just as reasonable and probable as the theory on which plaintiff rests its claim.

### January, 1964 Failure

Plaintiff's expert Karpe testified that he found what he described as the indicia of a "machining" type failure here and concluded that he believed this second occurrence was caused by the chlorine-based additive in defendant's oil. He based his conclusion upon a comparison of the photographs taken of the rotor and babbitt of the Pachemist after failure with photographs and data in the

literature regarding "machining" failures. Tr. 201–202.

Defendant's expert Professor Wilfred Campbell, who teaches the subject of lubricants at Rensselaer Polytechnic Institute and has authored numerous publications in the field of lubrication and wear and friction prevention (including a recent comprehensive survey of the literature on bearing failures which encompassed failures of this type), was of a distinctly contrary view. Tr. 244, 245, 253. He impressed us as an extremely able and fair witness; his testimony was of a high order. He gave it as his opinion that while Mr. Karpe's tests were of a high caliber, it is very difficult to relate such laboratory tests to actual service failures. Tr. 246, 264.

He further testified with impressive conviction that the scientific evidence to date had not established that chlorine-based oil either inhibits the complete embedment of particles or contributes to the type of progressive reaction as plaintiff contends. Tr. 251–256. In his opinion, the machining process described by Mr. Karpe as due to the use in the lubricating system of a chlorine-based oil simply does not occur in actual service on vessels. Tr. 264–269.

We need not resolve this conflict as to whether or not chlorine-based oil, such as Regal Oil 500 E.P., might produce a gross failure where one would not otherwise have occurred, because in our opinion plaintiff has failed to demonstrate that this second occurrence resulted from such a phenomenon and not from an excessive amount of foreign particles in the lubricating system (which would have caused the damage regardless of the oil in use).

Following his examination of photographs of the Pachemist's rotor and bearings after the second breakdown, the witness Campbell testified that scoring of the type therein shown can occur because of excessive particles regardless of the presence of chlorine in the oil.

Tr. 247–248, 251. He stated that he would not have expected more severe scoring of the babbitt than occurred in a non-chlorine failure caused by an excessive amount of foreign particles. Tr. 261–262.

He examined the photographs of the oil screen debris found in the duplex magnetic strainer of the Pachemist's lubricating system after the second breakdown. Tr. 249. It contained welding beads, sand, glass, and other material which did not result from the damage to the turbine. Tr. 249–250. He testified that a lubricating system with this amount of debris is not efficiently maintained. Tr. 250. Plaintiff's expert Karpe in fact acknowledged that he had never seen that large an amount of debris in a system. Tr. 218. We believe this residue indicates that contrary to plaintiff's contention and the December 21, 1963 report by the American Bureau of Shipping surveyor, the lubricating system was not "in good clean condition."

Heavy weather such as the Pachemist repeatedly experienced on route to and returning from its first voyage to Japan in late 1963 might have shaken loose particles lodged in various parts of the lubricating system Professor Campbell suggested. Tr. 250. He testified that such particles as were found could have passed through the turbine and caused the damage before reaching the strainer. Tr. 249. In his opinion it was probable that a high concentration of particles caused the damage in question. Tr. 259. He stated that such instances frequently occur after recommissioning of a vessel, for it is very difficult to get all of the large particles out of the system. Id.

When asked to assume that the debris found in the strainer of the Pachemist during repairs at Honolulu had actually circulated through the system, plaintiff's expert Karpe agreed that if this had occurred then that debris itself, regardless of the oil used, could have caused the scoring that was found. Tr. 240–241.

It was Professor Campbell's opinion, not contradicted by plaintiff's evidence, that the cleaning performed on the Pachemist's lubricating system during recommissioning and until after the second failure was not the "best method." Tr. 260. He maintained that the best practice in cleaning is to flush the whole system with a flushing oil. *Id.*

It was only after the second breakdown that plaintiff employed a flushing oil. After ten hours of such flushing it is reasonable to assume the system was finally thoroughly cleaned. It appears to us just as reasonable an inference that the apparent absence of further trouble resulted from this cleaning rather than from use of a non-chlorinated oil.

We find it at least as probable that the second breakdown resulted from an excessive amount of foreign particles in the lubricating system, rather than from the presence of chlorine in the lubricating oil. We are not satisfied from the proof adduced that Texaco's chlorine-based additive was a factor contributing to the failure. Plaintiff has therefore failed again to meet its burden on the issue of causation.

In sum, particularly for the reasons hereinabove outlined, the total trial record here fails to establish qualitatively or quantitatively proof of a convincing or credible nature to uphold or sustain the issues of liability asserted. At most, our attention has been called to what purports to be a theory; the sole trouble with it is that it lacks practical support.

### Conclusion

Accordingly, for all the reasons set forth above plaintiff has failed to sustain its burden of proof on either of its two claims. The Clerk is directed to enter judgment in favor of defendant and against plaintiff on both causes of action herein.

So ordered.