REPUBLIC CORPORATION,
Plaintiff,

v.

PROCEDYNE CORPORATION,
Defendant.

No. 70 Civ. 3726.

United States District Court,
S. D. New York.

June 18, 1975.

**1062**

Poletti Freidin Prashker Feldman & Gartner, New York City, for plaintiff; Murray Gartner, New York City, of counsel.

Finley, Kumble, Heine, Underberg & Grutman, New York City, for defendant; Alan M. Gelb, New York City, of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW.

LEVET, District Judge.

The above-named plaintiff, Republic Corporation ("Republic"), filed a complaint against defendant, Procedyne Corporation ("Procedyne"), alleging that defendant breached a contract entered into between the parties on or about March 13, 1969, and further that defendant breached certain express and implied warranties made in conjunction with said contract. Plaintiff contends that pursuant to their contract defendant was to provide Polytherm Plastics ("Polytherm"), an unincorporated division of plaintiff, with two separate electrical control systems, or consoles, which were represented to have the capacity to automatically and accurately control the heating units in two of Polytherm's thermoforming machines to a temperature variance of plus or minus 10° F. of the desired temperature. These thermoforming machines were an integral part of Polytherm's manufacturing process and required accurate temperature control to function properly.

Plaintiff alleges that the consoles provided by defendant did not function properly in that they failed to automatically and accurately control the heating units in the thermoformers to within plus or minus 10° F. of the desired temperature; that, therefore, defendant has breached its contract and its express and implied warranties. As a result of said breach plaintiff asserts that it has sustained damages in the amount of $61,217.29.

Defendant by its answer admits an agreement to sell the consoles in question to Republic for use in the Polytherm plant but denies that it breached the contract pursuant to which these consoles were sold and delivered; and further denied that it breached any express or implied warranties made to plaintiff in conjunction with said contract.

Defendant also alleges, as an affirmative defense, that the consoles were tested and accepted by plaintiff as delivered and that plaintiff has thereby waived any claim it may have had against defendant and is estopped from asserting the same.

Defendant has also asserted a counterclaim in the amount of $2,377.10 with interest which it claims represents the value on a time-and-materials basis of work done on the consoles and thermoformers at Polytherm's request after delivery and acceptance of the consoles.

After hearing the testimony of the parties, reviewing the transcript of the trial (which was available December 5, 1974) and examining the exhibits and the Proposed Findings of Fact and Con-

clusions of Law submitted by plaintiff and defendant on March 21, 1975 and April 21, 1975, respectively, along with each party's objections to the Proposed Findings of Fact and Conclusions of Law of the other, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. This court has jurisdiction over the subject matter and parties of this action pursuant to 28 U.S.C. § 1332(a).

2. During the period between January 1969 to at least the beginning of 1970 Polytherm, an unincorporated division of Republic, a corporation incorporated under the laws of Delaware and with its principal place of business in the State of California, was engaged in the manufacture and sale of plastic disposable bowls, dishes, trays and food containers. (Tr. 9, 10, 12.) [1]

3. During that period, and thereafter, Procedyne, a corporation incorporated under the laws of New York and with its principal place of business in the State of New Jersey, was engaged in the manufacture and sale of equipment primarily involving the precision temperature control of resistance heaters. (Tr. 585–86.)

4. Plaintiff's manufacturing process required the use of machines known as "thermoformers" which converted sheets of flat plastic into three-dimensional shapes which constituted its finished product. Thermoformers accomplish this conversion by transporting flat sheet material through a heating oven section, which consists of upper and lower tiers of heaters, so as to soften the plastic material, then by further transporting the heated sheet into a molding area where pressure, from the closing of matched molds, shapes the material, and finally, by transporting the newly molded sheet to a die cutting area where the finished pieces are cut from the sheet. (Tr. 11, 12, 45.)

5. In order for the thermoformers to operate properly and efficiently it was essential that the sheet of plastic be uniformly and precisely heated to a predetermined temperature. Overheating the plastic would cause it to melt and drip while underheating would prohibit proper molding of the plastic. (Tr. 82, 85.)

6. Plaintiff's Polytherm plant was equipped with at least two thermoforming machines, one Brown 821 machine and one NRM machine. The ovens of both machines were equipped with ceramic type heaters known as Elstein heaters, installed by plaintiff's personnel, which generated heat by means of electric current. Because these heaters were smaller and more compact than their commercially available counterparts, normally provided in the Brown and NRM thermoformers, they produced tighter temperature control in the ovens, which is one reason plaintiff chose them for its manufacturing process. The Brown and NRM machines, as sold commercially, are equipped with controllers; however, plaintiff sought to achieve an exactitude of temperature control in the Elstein heaters which could not be achieved by the controllers with which the thermoformers were ordinarily equipped. (Tr. 149–53, 449.)

7. Plaintiff's personnel had no expert knowledge in the design or manufacture of devices to control the temperature of the heaters in the thermoformers. (Tr. 5, 173, 241–42.)

8. In 1969 defendant was engaged in the business of designing and manufacturing temperature control devices. It employed persons skilled in electrical engineering such as Dr. Staffin who has bachelor's, master's and doctorate degrees in electrical engineering and has had extensive experience and expertise in the electronics field and, particularly, in the field of temperature control of electric resistance heaters. (Tr. 585–601.)

---

1. References preceded by "Tr." are to pages of the stenographic transcript of the trial.

9. On or about January 15, 1969 defendant submitted a report to plaintiff (Pl.Ex. 3),[2] which represented the results of a controller test conducted by Dr. Staffin for Polytherm. The test had been conducted to determine the general performance criteria for control of Elstein heating elements, such as those used in plaintiff's thermoformers. The report of Dr. Staffin concluded that a thermocouple controller should perform satisfactorily in meeting the requirement that said heaters maintain a temperature not varying more than plus or minus 10° F. of the specified temperature setting while in operation. (Pl. Ex. 3; Tr. 23.)

10. Pursuant to said test results, on or about January 15, 1969 defendant also submitted a proposal and quotation to plaintiff (Pl.Ex. 4) offering to sell the plaintiff specified Heater Control Consoles. This quotation contained the various specifications of said consoles and the price for each console ordered. Defendant represented that the consoles would be capable of maintaining the temperature variations within the heaters to plus or minus 10° F. (Pl.Ex. 4; Tr. 20.)

11. Defendant's offer (Pl.Ex. 4) was accepted by plaintiff's Purchase Orders dated February 24, 1969 (Pl.Ex. 5) and March 13, 1969 (Pl.Ex. 6), which pertained to the purchase of consoles for the Brown 821 thermoformer and the NRM thermoformer respectively. The specifications contained in both Purchase Orders were identical, with the exception that each order referred to a separate thermoformer and heater control console. (Pl.Exs. 5, 6; Tr. 26–30.)

12. The written contract entered into between plaintiff and defendant consisting of the proposal and quotation from defendant (Pl.Ex. 4) and plaintiff's Purchase Orders (Pl.Exs. 5, 6) was modified on or about May 2, 1969 by a signed agreement of both parties. (Pl. Ex. 7.)

13. The written contract, as modified, essentially provided for the following pertinent conditions and obligations of the respective parties:

(1) Defendant is to provide the completed consoles with terminal boards to facilitate all external field connections, and is responsible for the proper functioning of all internal components of the consoles.

(2) Plaintiff shall be responsible for the installation and wiring of all externals to the consoles, including the connection of the heaters, thermocouples and power source.

(3) Defendant has responsibility for insuring the proper field operation of the heaters. The consoles are to be capable of holding the surface temperature of the heaters to plus or minus 10° F.

(4) Defendant is responsible for the side by side operation of the consoles but is not responsible for interference effects due to external equipment from other manufacturers.

(5) Defendant will install interference suppression equipment if required on a straight time-and-materials charge basis.

(Pl.Exs. 4–7.)

14. The purpose of these consoles was to insure that the temperature within the thermoformer ovens is maintained within the restricted acceptable variation specified, and defendant was fully aware of this purpose at the time it entered into this contract. (Pl.Ex. 3; Tr. 601.)

15. Defendant selected and designed the means by which the consoles were to maintain the desired temperature of the heaters in the thermoformers; and defendant assumed total responsibility for the proper function of all internal components of the consoles. (Pl.Ex. 7; Tr. 784, 851.)

16. Defendant delivered two electrical control consoles, one for the NRM

2. "Pl.Ex." and "Def.Ex." refer to plaintiff's and defendant's exhibits respectively, entered in evidence.

thermoformer and one for the Brown thermoformer, to plaintiff on or about June 18, 1969 and July 2, 1969 respectively. The console provided for the Brown thermoformer consisted of 32 temperature control units and that provided for the NRM thermoformer consisted of 40 temperature control units. (Pl.Exs. 5, 6, 10, 11.)

17. The aforesaid consoles were connected to the thermoformers prior to July 14, 1969 at the Polytherm plant. Connecting said consoles to the thermoforming machines required that each individual controller be wired to a single heater zone in the thermoforming machines.

Defendant had provided a terminal strip on the outside panel of each console to facilitate the necessary wiring. Said wiring was accomplished by interconnecting an individual set of wires for each heating zone between the terminal strip on the console and a terminal strip consisting of thermocouple jack assemblies on the thermoformer. The thermocouple jack assemblies were individually connected to heat sensitive thermocouples which measured the temperature of each Elstein heating zone separately.

Each controller was equipped with a temperature setting knob and dial, as specified, by which plaintiff could set the desired temperature of an Elstein heater zone in the thermoformer oven. (Pl.Exs. 5, 6, 22; Tr. 258–63, 281–82, 637–38.)

18. The function of the thermocouple was to detect the amount of heat at the surface of the heater zone and transmit that information to the controller in the console which in turn would automatically increase or decrease, depending upon the temperature reading, the amount of electricity flowing to the resistance heaters in the thermoforming machine, thereby maintaining the desired heating level. The amount of electricity permitted to flow to the heater is controlled by a triac which is an electronic "valve." (Tr. 601, 909.)

19. As required by the contract, plaintiff and its independent contractor, JEB Electric, installed the wiring connecting the consoles to the heater zones and connected the thermocouples. None of that work was performed by defendant. (Tr. 33–34, 642–43, 655.)

20. On or about July 14, 1969 plaintiff requested that Dr. Staffin come to the Polytherm plant to check the consoles, stating that they did not appear to be operating properly. (Tr. 620–21.)

21. Accordingly, on or about July 14, 1969 Dr. Staffin visited the Polytherm plant and inspected the consoles personally and discovered a large number of defects and major structural alterations both in the consoles themselves and the thermoformers, which caused approximately one-half of the heater zones to malfunction when tested and observed by him.

These defects consisted of reversed polarities in the thermocouples, which were color coded to avoid this problem; wires reversed at the thermocouple junction; crossed wires; double reversal of polarities in the extension wires; improper connections to the extension wires and plugs; improperly installed jack assemblies; burned wires; twisted thermocouple backs; charred insulation; broken triacs, an essential electrical component in the system; faulty attempts to replace or repair broken triacs.

Twisting of the thermocouples produces erroneous readings as to the actual temperature of the heating zone in the thermoformer ovens, causing the controller to react improperly. (Tr. 621–22, 638, 641–44, 646, 653–54, 660.)

22. The major structural alterations Dr. Staffin found consisted of plaintiff's unilateral decision to move the main power disconnect box on the 40-zone console from one side of the console to the other, after it had been delivered to the Polytherm plant. This alteration included reversal of all the internal wiring of the console, cutting of all the harnesses

of the wires, and trimming, splicing, extension, folding, cutting and lacing back of approximately 80 wires.

Further, since the main power disconnect box was moved into a position which blocked the flow of air from the cooling fans, which had been originally installed by defendant and were essential to insure that the electronic devices in the consoles did not overheat, these cooling fans were totally removed by plaintiff. At that time Dr. Staffin advised plaintiff of the necessity of reinstalling the fans, but they had not been replaced as late as October, 1969. (Tr. 164, 167–68, 200–201, 287, 625–28, 681–86.)

23. On July 14, 1969 Dr. Staffin demonstrated to the president of plaintiff's Polytherm plant, Dr. Zwiebel, that defective wiring was the reason for the malfunctioning of the consoles. Dr. Staffin further stated that none of the problems encountered with respect to the functioning of the thermoformers was related to any defects in the consoles. Dr. Zwiebel acknowledged that the reason for the malfunctioning of the consoles was indeed the improper wiring which his personnel had performed. Dr. Zwiebel then requested that Dr. Staffin "help us straighten it out and get it working," which Dr. Staffin agreed to do. (Tr. 660–61.)

24. Pursuant to his agreement to assist plaintiff in correcting the improper installation of the consoles, Dr. Staffin showed plaintiff's personnel how to repair the defects, by demonstration, by explaining color coding and by explaining thermocouples and how they are sensitive to twists. Dr. Staffin observed them doing some of this work. (Tr. 472–73, 661–63.)

25. Polytherm employees made the necessary repairs on the 32-unit console first. When they had completed that one they moved on to the 40-unit console. Dr. Staffin then operated the 32-unit console, after it had been properly connected to the thermoformer, for approximately three to four hours, during which time it maintained the temperature setting without malfunction. After the Polytherm employees had made the necessary corrections on the 40-unit console, Dr. Staffin operated it for approximately 30 to 40 minutes. It also maintained temperature for this period of time without malfunction. (Tr. 660–65.)

26. Dr. Staffin then demonstrated to Dr. Zwiebel that the consoles operated correctly when they were properly installed and therefore requested payment for them. Dr. Zwiebel replied that he would formally accept the consoles as delivered and approve payment. Dr. Staffin added that any further work done on the consoles would have to be done on a time-and-materials basis, payable to defendant by plaintiff, to which Dr. Zwiebel agreed. (Pl.Ex. 13; Tr. 39–43, 289–91, 297–304, 665–66.)

27. Dr. Zwiebel's oral acceptance of July 14, 1969 was followed by his formal written unconditional acceptance on July 16, 1969, stating:

"As per our discussion of July 14, 1969, this letter is to confirm acceptance of two panel control consoles from your company as delivered."

(Pl.Ex. 12.)

28. The Brown 32-zone thermoformer with the console attached was first used in production, that is, actually heating and molding sheets of plastic into the finished product, in late July, 1969. The NRM 40-zone thermoformer with the console attached was first used in operation in September, 1969. (Tr. 48–49, 52, 278, 282.)

29. Plaintiff called Dr. Staffin in September, 1969, stating that they were again experiencing erratic heating in the thermoformers when being used in production. Upon plaintiff's request, Dr. Staffin sent one of defendant's technicians, Mr. Heaton, to the Polytherm plant to investigate the problem. Apparently, the malfunction was again due to installation defects which were corrected. When Mr. Heaton left the Polytherm plant, the thermoformers were operating properly.

Defendant sent a bill to plaintiff for the service call of Mr. Heaton, which plaintiff paid in full. (Def.Ex. A; Tr. 693, 695–96, 699–700.)

30. Plaintiff called Dr. Staffin again in October, 1969, complaining that the thermoformers were again malfunctioning. Again, Dr. Staffin sent a technician to the Polytherm plant for whose service call plaintiff received a bill which it subsequently paid in full. (Def.Ex. B; Tr. 700–701.)

31. On or about October 27, 1969 Dr. Zwiebel called Dr. Staffin stating that they were still experiencing erractic heating problems with the thermoformers when they were being used in production. The result of this conversation was a quotation (Pl.Ex. 14), dated October 30, 1969, from defendant to plaintiff setting forth pricing information for the purchase and installation of 40 solid state power varying drivers to be installed in the 40-zone NRM thermoformer. (Pl.Ex. 14; Tr. 702–706.)

32. On or about November 7, 1969 plaintiff issued its Purchase Order (Pl. Ex. 15) for the purchase and assistance in the installation of said power varying drivers. Dr. Zwiebel admitted that the power drivers were delivered and installed and that on or about December 30, 1969 plaintiff received a bill for $2,377.10 representing the total amount due for the purchase of the drivers and the technical and manual assistance in their installation (Def.Ex. I). Dr. Zwiebel also admitted that this bill has never been paid by plaintiff. (Pl.Ex. 15; Def.Ex. I; Tr. 183, 706–707.)

33. A solid state power varying driver is a manually controlled device which does not utilize a thermocouple. It simply regulates the amount of electricity sent to each heater. These devices do not have the capacity to measure the temperature of each heater zone and automatically regulate the flow of electricity to said zone, they must be manually controlled. The introduction of these devices totally eliminated the capacity of the consoles to automatically control temperature within the original specification of plus or minus 10° F. and therefore constituted a total and fundamental change in the electronic process by which the 40-zone console operated. (Tr. 705–715, 909–910.)

34. In January, 1970 Dr. Zwiebel again called Dr. Staffin, stating that the thermoformers were still not operating properly. Dr. Staffin himself visited the Polytherm plant to make tests in order to ascertain the causes for said continued malfunction. (Tr. 708–715.)

35. Dr. Staffin determined that the recently installed power varying drivers were functioning adequately with the exception of some interference from other machines which were simultaneously operating in the immediate area of the plant.

Since July, 1969 a large number of other thermoformers had been moved into the Polytherm plant. The other machines operated with a different type of controller which involved relay switches. These relay switches caused transients to appear on Dr. Staffin's oscilliscope when he tested the Brown and NRM thermoformers. A transient is an unwanted interference spike in the electricity flowing into the machines. Such spikes often cause the triacs to blow out, thereby totally removing the controller's capability to regulate the flow of electricity to the heater, either manually or automatically. (Tr. 716–722.)

36. Dr. Staffin demonstrated these interference effects to Dr. Zwiebel and explained what could be done in an attempt to suppress them. In fact, Dr. Staffin installed 13 interference suppression devices at that time. He explained that it would take a couple of weeks to determine whether the devices were successful in suppressing the interference.

However, Dr. Zwiebel demanded that Dr. Staffin guarantee that this equipment and additional work would correct all the problems they had been experiencing to that date. Dr. Staffin said that he could not guarantee that the ex-

tra work would help; in fact, he could not guarantee that any further work would help. Dr. Zwiebel then said that plaintiff would not pay defendant for any further work unless it corrected the problem. Since Dr. Zwiebel refused to pay for any further services on a time-and-materials basis, as agreed on or about July 14, 1969, Dr. Staffin refused to do any further work on the consoles or thermoformers. (Tr. 723–730.)

37. In February, 1970 Dr. Zwiebel wrote a letter to Dr. Staffin requesting that he authorize the return of both consoles and refund the money paid to defendant for them. The consoles were not returned and the money has not been refunded. (Tr. 93–94, 100, 103–104.)

38. I find that plaintiff has not proved by a fair preponderance of the credible evidence that the consoles as delivered were not in compliance with the specifications of the contract and all warranties made with respect thereto.

39. I find that on or about July 16, 1969 plaintiff unconditionally accepted the consoles as delivered. (Pl.Ex. 12.)

40. I find that plaintiff failed to prove by a fair preponderance of the credible evidence that it performed its singular obligation under the terms of the contract, that is, to make the necessary external connection of the console to the thermoformer. I further find that the interconnecting wiring attempted by plaintiff and its independent electrical contractor, as required by the terms of the contract, was performed negligently and carelessly.

41. I find that plaintiff unilaterally and materially altered the console produced for the NRM 40-zone thermoformer by moving the main power disconnect to the opposite side of the console and removing the cooling fans. Such alteration represented a major rewiring of the internals of the console.

42. I find that plaintiff has failed to prove by a fair preponderance of the credible evidence that the consoles would not have controlled the heaters in the thermoformer within the contract specifications if they had been properly wired to the thermoformers. I further find that the periodic inability of the consoles to hold the desired temperature in the heaters within a variation of plus or minus 10° F. was a direct product of plaintiff's negligent installation and maintenance of the consoles and the connective wiring.

43. Hence, I find that plaintiff has failed to prove by a fair preponderance of the credible evidence that defendant breached its contract with plaintiff or that defendant breached any express or implied warranties made to plaintiff in connection with said contract.

44. I find that at plaintiff's request defendant provided plaintiff with 40 solid state power varying drivers and the technical and manual assistance necessary to install said drivers. I further find that the bill for said services in the amount of $2,377.10 was reasonable and in accordance with the quotation defendant provided plaintiff (Pl.Ex. 14) prior to plaintiff's Purchase Order of said goods and services. (Pl.Ex. 15.)

45. Plaintiff is liable for the sum of $2,377.10 plus interest as reasonable compensation due defendant for the goods and services rendered pursuant to plaintiff's Purchase Order (Pl.Ex. 15).

## DISCUSSION

### BREACH OF CONTRACT

██ ██ The elements of an action for breach of contract are (1) formation of a contract between plaintiff and defendant; (2) performance by plaintiff of any dependent conditions or conditions precedent; (3) defendant's failure to perform; and (4) resulting damage to plaintiff. Plaintiff, having made this claim, has the burden of proving each of these elements by a fair preponderance of the credible evidence.

The formation of a valid contract between plaintiff and defendant is not in question here. (Findings 10–12.) What is in question is the performance

by plaintiff and defendant of their respective obligations arising under the terms of that contract.

Briefly, the terms of the contract essentially required (1) that defendant deliver the control consoles ready to be wired to the thermoformers; (2) that plaintiff perform the necessary interconnecting wiring between the consoles and the thermoformers; and (3) that defendant insure that the consoles control the temperature in the thermoformer's ovens. (Finding 13.) These obligations must necessarily be performed in the order listed since each succeeding obligation cannot be performed until the prior obligation has been accomplished.

■ It is a general rule that where a contract requires successive acts to be performed by the parties, the covenants which relate to that contract are dependent. *Trustees of Columbia University v. Kalvin*, 250 N.Y. 469, 473, 166 N.E. 169 (1929).

> "[W]here the covenants are dependent, the performance of one party's covenant is a condition precedent to the right of that party to recover for a breach of the covenant by the other party."

*Broad Properties, Inc. v. Wheels, Inc.,* 43 A.D.2d 276, 279, 351 N.Y.S.2d 15, 19 aff'd 35 N.Y.2d 821, 362 N.Y.S.2d 859, 321 N.E.2d 781 (1974). The terms of this contract obviously required successive performance by both parties. Since these covenants are dependent, defendant cannot be liable for the failure of the heaters to maintain temperature as specified until plaintiff has performed its prior condition, that is, making the necessary interconnecting wiring between the console and the thermoformer. *Rosenthal Paper Co. v. National Folding Box and Paper Co.,* 226 N.Y. 313, 319, 123 N.E. 766 (1919). Plaintiff cannot maintain an action for breach of contract until it has proved by a fair preponderance of the credible evidence that it is free from fault with respect to performance of its part of the agreement. Id. at 322, 123 N.E. 766.

■ Although CPLR § 3015(a) provides that plaintiff need not plead the performance of a condition precedent in a contract, plaintiff has pleaded such performance, Complaint ¶ 6.

> "Plaintiff has otherwise performed all of its obligations on its part to be performed pursuant to said agreement."

Plaintiff's only obligation, other than payment for the consoles, which defendant admitted by its answer, was to make the necessary interconnecting wiring between the consoles and the thermoformers. Defendant admitted paragraph 6 of the Complaint with the sole exception that defendant specifically denied plaintiff's performance with respect to said installation wiring, Answer ¶ 5. Since plaintiff specifically stated that it had performed its singular obligation under the contract, that is, to properly install the console, defendant's denial put plaintiff on notice as to what he would have to establish at trial.

> "Indeed, there is no need for further specification and more particularity in order to apprise the plaintiff of the defendant's position. Moreover, to hold otherwise would result in a formalism . . . as objectionable as that . . . which CPLR 3015(a) intended to obviate, and do violence to the legislative command that the CPLR 'shall be liberally construed. . . .' (CPLR 104.)"

*Allis-Chalmers Mfg. Co. v. Malan Construction Corp., et al.,* 30 N.Y.2d 225, 233–34, 331 N.Y.S.2d 636, 641, 282 N.E. 2d 600, 603 (1972). Therefore, since plaintiff's performance was undeniably at issue, plaintiff had the burden of proving by a fair preponderance of the credible evidence that it had in fact performed its obligation under the contract.

■■ When a person contracts to do certain work he is charged with the duty of exercising reasonable care and skill in the performance of the work required to be done by the contract. *Trans Caribbean Airways, Inc. v. Lockheed Aircraft Service-International, Inc.,* 14 A.D.2d

749, 220 N.Y.S.2d 485 (1961); *Rosenbaum, et al., v. Branster Realty Corp., et al.,* 276 A.D. 167, 168, 93 N.Y.S.2d 209 (1949). Plaintiff's failure to exercise reasonable care and skill in the performance of its obligation under the contract (Finding 40) constitutes negligence and bars any recovery by plaintiff under its claim for breach of contract.

All the credible evidence in this case demonstrated unremitting negligence, incompetence and ineptitude on the part of plaintiff's personnel in their physical handling of the consoles, destroying internal components, totally miswiring connections to the heaters and materially altering the consoles.

### BREACH OF WARRANTY

■ Plaintiff's allegation that defendant breached expressed and implied warranties regarding the consoles' capacity to maintain the temperature of the heaters to within plus or minus 10° F. of the desired temperature is without foundation. Plaintiff has failed to prove by a fair preponderance of the credible evidence that any failure of the heaters to hold temperature within the plus or minus 10° F. specification resulted from any fault on the part of defendant. On the contrary, defendant has demonstrated plaintiff's pervasive negligence in performing its obligation under the contract, which negligence was demonstrated to be the cause of the heater malfunction. (Findings 21–26.) Plaintiff may not recover for breach of warranty

"[w]here the facts proven show that there are several possible causes of 'an injury, for one or more of which defendant was not responsible, and it is just as reasonable and probable that the injury was the result of one cause or the other . . . ."

*Antilles Shipping Co. v. Texaco, Inc.,* 321 F.Supp. 166, 167 (S.D.N.Y.1970), quoting *Natale v. Pepsi-Cola Co., et al.,* 7 A.D.2d 282, 182 N.Y.S.2d 404 (1959). If the essential cause of the failure is something other than the alleged breach of express and implied warranties, the defendant is not liable. 7 A.D.2d at 284, 182 N.Y.S.2d 404.

### PLAINTIFF'S ACCEPTANCE

■ Plaintiff unconditionally accepted the consoles orally and in writing "as delivered" (Pl.Ex. 12) after it was sufficiently demonstrated that the failure of the heaters to maintain temperature within the desired variation was due entirely to plaintiff's own faulty wiring and alteration of the consoles, and not due in any respect to any malfunctioning of the consoles. (Findings 26, 27.) Such acceptance can be revoked only if the acceptance was made prior to the discovery of a latent defect, and the revocation occurs within a reasonable time after plaintiff discovered said defect and before any substantial change in the condition of the goods. U.C.C. § 2–608.

■ First of all, plaintiff has failed to prove that the consoles, as delivered, were defective in any respect. (Finding 38.) Secondly, plaintiff did not attempt to revoke its acceptance until February, 1970 (Finding 37) while plaintiff alleges the consoles were defective from the date of their delivery. Further, plaintiff had ample opportunity to test the consoles in production as early as July, 1969, when they had been installed. Thirdly, the installation of the 40 solid state power varying drivers in the NRM 40-zone console in January, 1970 totally altered the basic functioning capability of that console. (Findings 32, 33.)

Consequently, plaintiff's attempted revocation was neither timely nor supported by the facts of this case and is therefore without merit.

### DEFENDANT'S COUNTERCLAIM

■ Although the trial of this action pertained to liability only, both parties entered documents in evidence which eliminated any genuine issue of fact as to the amount of damages defendant is entitled to by way of its counterclaim. Plaintiff's Purchase Order (Pl.Ex. 15) was issued pursuant to defendant's quo-

tation (Pl.Ex. 14), both of which clearly and unequivocally set forth the price to be paid for the goods and services to be provided. (Findings 31, 32.) Defendant's subsequent bill for said services in the amount of $2,377.10 (Def.Ex. I) was in accordance with the quotation and Purchase Order (Finding 44). "In fixing damages the object generally is . . . to put [Procedyne] in as good a position as [it] would have been had [Republic] abided by its agreement." *New York Water Service Corp. v. City of New York,* 4 A.D.2d 209, 213, 163 N.Y.S.2d 538, 542 (1957). Plaintiff having freely entered into this contract with full knowledge of the price to be paid, cannot now be heard to dispute the reasonable value thereof. Hence, since there is no doubt that there is no genuine issue of fact to be tried with regard to the value of the goods and services which defendant provided plaintiff, any further trial as to said damages is absolutely unnecessary.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. § 1332.

2. Plaintiff has failed to prove by a fair preponderance of the credible evidence that it was free from fault with regard to the performance of its obligation under a contract entered into between it and defendant.

3. Plaintiff has failed to prove by a fair preponderance of the credible evidence that defendant breached said contract in any respect.

4. Plaintiff has failed to prove by a fair preponderance of the credible evidence that defendant breached any warranties, express or implied, made to plaintiff in conjunction with said contract.

5. Plaintiff unconditionally accepted the control consoles "as delivered" by defendant.

6. Defendant is entitled to judgment dismissing the complaint with costs.

7. Defendant is further entitled to judgment on its counterclaim against plaintiff in the sum of $2,377.10 plus interest from December 30, 1969, which represents the reasonable value of the goods and services provided plaintiff pursuant to plaintiff's Purchase Order (Pl.Ex. 15), dated November 7, 1969.

Settle judgment promptly upon notice pursuant hereto.