**BEALL PIPE & TANK CORPORATION,**
a corporation, Appellant,

v.

**SHELL OIL COMPANY,** a corporation,
Appellee.

**No. 20033.**

United States Court of Appeals
Ninth Circuit.

Jan. 4, 1967.

Mautz, Souther, Spaulding, Kinsey & Williamson, and John L. Schwabe, and James H. Bruce, James M. Burns, of Benson, Whitely, McLennan & Burns, Portland, Or., for appellant.

Lamar Tooze, Lamar Tooze, Jr., Arden E. Shenker, of Tooze, Powers, Kerr, Tooze & Peterson, Portland, Or., for appellee.

Before MERRILL, BROWNING and DUNIWAY, Circuit Judges.

MERRILL, Circuit Judge:

With jurisdiction grounded upon diversity of citizenship, appellant (Beall) has brought suit against appellee (Shell) for damages resulting from alleged product defect. Jury trial resulted in a verdict for Beall. Challenging the sufficiency of the evidence to support the verdict, Shell then moved for new trial and for judgment *non obstante veredicto*. The District Court granted both motions and entered judgment for Shell;[1] this appeal followed. We affirm.

The product involved is Shell Culvert Coating Compound, an asphalt product.

Beall is a manufacturer of tanks, pipes and trailers, with plants in various western states. Among its pipe products are culvert pipe, a corrugated, galvanized product used for conveyance of water under roadways, and "smooth" pipe, an ordinary steel product used for carrying water under pressure in domestic water and irrigation systems. This lawsuit concerns the latter.

The processing of pipe involves dipping it in hot asphalt to achieve a protective coating of the metal surface. Beall's Portland, Oregon, plant was dipping both culvert and smooth pipe. Culvert pipe was dipped in a horizontal vat, while smooth pipe, since 1924, had been dipped in a 53-foot vertical vat. Originally the vertical vat accommodated a pipe production of 300 to 500 feet per shift. Improved production mills were installed and by 1959 Beall had a pipe-making capacity of 30,000 feet per shift—a sixty-fold increase in demand upon the vat.

The adhesion of asphalt to metal is accomplished when both asphalt and metal are heated to a temperature at which the asphalt is a fluid of low viscosity and "wetting" of the surface by the asphalt occurs, permitting a molecular adhesion to the metal surface. If the temperature in the vat is too low the viscosity of the asphalt increases, and the ability to wet varies inversely with viscosity. If the asphalt is hot enough but the metal is not, the asphalt will chill at contact and will not wet the surface properly. On the other hand, prolonged overheating of asphalt will cause it to deteriorate and result in an inferior coating. Temperature control is thus essential if adhesion failure is to be avoided.

The Shell product was developed for use in the culvert or drainpipe field, where specifications are fixed by highway departments or other governmental agencies on the basis of performance experience. The Shell asphalt base produced in Venezuela was shipped to the United States where it was processed by the Trumbull Asphalt Co. to meet culvert specifications established by Armco, a large processor. It met the standards of the Oregon Highway Department.

For over thirty years, until 1959, the asphalt used by Beall had been the product of the Witco Chemical Company. In July, 1959, Beall commenced use of Shell's product in its horizontal vat for culvert coating. Three months later it started to use the Shell product in coating its smooth pipe in the vertical vat.

Commencing in April 1960, Beall received complaints respecting its smooth pipe. Farmers were discovering that the asphalt was disengaging from the inside of the pipe and clogging their irrigation sprinklers. By late August, complaints

---

1. F.R.Civ.P. 50(c) (1).

had grown so numerous that Beall ceased using Shell asphalt and reverted to Witco. Beall also received some complaints respecting Witco-dipped pipe processed before switching to Shell. After shifting back to Witco it continued receiving complaints. In 1963 Witco refused to sell further to Beall without an express disclaimer.

The main issue in the case is as to the cause for the asphalt's failure to adhere. Beall contends that Shell's asphalt was defective. In its complaint it charges that Shell "was negligent, careless and reckless in its manufacture and preparation of the coating compound," and that there was a breach of an express warranty or of an implied warranty of fitness. Shell's position, in defense, is that Beall misused a good asphalt; that with the drastic increase in production it relaxed temperature control in the vertical vat and was either dipping cold pipe, or cracking the asphalt by overheating.

The judge and the jury disagreed as to how this basic issue should be resolved upon the record. The jury held for Beall. The court then ruled that "the evidence is so insufficient to support the verdict and the verdict so contrary to the weight of the evidence" that a new trial was required. Upon a study of the record we fully agree.

The District Court went further, however; it held on other grounds as a matter of law that both the neglience and warranty claims must fail. A study of the record convinces us that insufficiency of the evidence is such as to support judgment n. o. v. as well as new trial.

Shell established without dispute that the custom in the industry is to rate asphalt according to physical properties such as hardness, flashpoint, melting point and viscosity; that Shell asphalt met rigid tests for these properties established by the Armco Company and by various state highway departments, including Oregon's.

■ Shell's strong case in this respect and its impressive proof of changes in Beall's production methods and relaxed attention to temperature control overwhelmed any inferential weight which Beall might claim to attach to the fact of adhesion failure standing alone, as to either the negligence or the warranty claim. The burden was thus cast upon Beall to make a factual showing both of breach (of duty of care, or of warranty) and of causation.

We may assume arguendo that a sufficient case for the jury was made as to breach of duty of care; that Beall had, as to negligence presented testimony as to a standard of manufacturing performance which Shell had failed to meet. We may further assume that as to warranty Beall had fixed on a product defect upon which breach of warranty might be mounted.[2]

2. This assumption strains to read the record in favor of Beall. The testimony of its two expert witnesses is crowded with inconsistency to a point verging on incredibility. Indeed, their theory of defect appears to be disputed by the very facts advanced to support it.

Their testimony was based not on the results of tests of physical properties, but on a partial chemical analysis, separating asphalt by solvent fractionation into general groups of chemical compounds having similar properties. Both men admitted the novelty of their theories, and that an exact chemical analysis of a substance as complex as asphalt is not feasible.

Reading the testimony of the two experts together, the three relevant chemical groups were: (1) asphaltenes—high molecular weight hydrocarbons which exist as solids dissolved in the other components; (2) reactive components; (3) unreactive oils, mostly paraffins. Reactive components, with age, may change into asphaltenes. The higher the percentage of asphaltenes, the harder the asphalt.

Both witnesses analyzed Shell asphalt for its stability over time. Both agreed that the higher the ratio of reactive components to others, the more unstable the asphalt, and the higher the probability that it would deteriorate in quality with the passage of time, the reactive components changing into asphaltenes and hardening the asphalt into a brittle coat-

In our judgment, however, there is no evidence whatsoever from which the jury might rationally have concluded that such product defect was the cause of the asphalt's failure to adhere.[3]

Conclusive, in our view, is the fact that Witco asphalt (which for many years had served Beall successfully), was the standard to which the expert testimony was keyed. The conclusion of one of the witnesses that Shell was defective was based on Shell's failure to meet the witnesses' standards of stability over time in which respect Witco was assumed to be satisfactory. Comparing Shell with Witco, the other witness concluded that Shell was defective in that it possessed a substantially higher percentage of reactive components, making for instability. This, then, was the measure of Shell's alleged breach—departure from the Witco standard.

The fact that during the critical period Witco also failed to adhere demonstrates that lack of Witco quality in any respect was not the cause of Shell's adhesion failure. Even without the alleged breach, failure would still have resulted.

Judgment affirmed.

---

ing, which would flake or crack and break off. One witness compared Shell with Witco and concluded that Shell contained a substantially higher ratio of reactive components and was thus inferior.

The tests conducted by the other witness, however, appear to destroy the probative value of this conclusion. His tests were made on samples of used pipe. Most were on pipe that had proved defective, but some were from sound pipe. An examination of his data shows that the best result in what he designated as "aging ratio" (reactives to others) was achieved by a sample of defective pipe coated with Shell, while one of the worst was shown by pipe coated with Witco, which he admitted he had assumed was a good product. Further, the samples from defective pipe show aging ratios comparable to the figures for sound pipe, the Shell and Witco figures were generally comparable, and the figures do not appear to establish any consistent pattern.

A second theory of defect was advanced by this witness. He asserted that an excessive amount of paraffins would cause the asphalt to ooze liquid oils at the point of contact with the pipe and result in the coating peeling off. Lack of consistency in the samples tested robs this theory of any supporting proof upon the question of what the standard should be. For example, of thirty Shell samples tested the one second lowest in oils (8.1%) failed five months after purchase, while the one highest (36.1%) failed fifteen months after the purchase, and the one second highest (33.6%) failed twenty-four months after purchase.

Further, the other witness who tested only fresh asphalt showed as the result of his analysis that Witco's percentage of oils was 42% as compared to Shell's 29%. If Witco be the accepted standard, Shell more than met it in this respect.

It is also significant that neither expert was knowledgeable in pipe dipping processes, nor had either analyzed heated vat asphalt, in the form applied to the pipe.

3. In its memorandum opinion the District Court noted that " * * * [N]either expert could explain why, * * * if chemical change of asphalt occurs only with 'time,' some of the failures asserted by Beall were discovered within a period of a few weeks after the dipping of the pipe." Further, it noted, "Nor is there any evidence, expert or otherwise, to explain why, if the Beall smooth pipe failures were due to the comparatively poor aging quality of the Shell product, the same kind of smooth pipe coating failure occurred during about the same period on pipe dipped with Witco PMR coatings —a standard coating which Beall claims it had been using successfully on such pipe for many years up to mid-1959— except only the suggestion by Beall that the Witco coating must also suddenly have developed a similar poor aging quality."