**WATER WORKS & INDUSTRIAL SUPPLY COMPANY, a Corporation, Appellant,**

**v.**

**Claud WILBURN, Appellee.**

Court of Appeals of Kentucky.

Nov. 29, 1968.

Rehearing Denied March 28, 1969.

J. D. Atkinson, Sr., and J. D. Atkinson, Jr., Atkinson & Atkinson, Greenup, H. Lakin Ducker, Ducker & McCreight, Huntington, W. Va., for appellant.

C. B. Creech, Ashland, for appellee.

CULLEN, Commissioner.

Appellee Claud Wilburn obtained a contract for construction of a water main for the Quicksand Water District. He arranged to purchase his materials, including pipe, fittings and gaskets, from the appellant, Water Works and Industrial Supply Company. After the main was installed and the water was turned on a series of "blow-outs" developed at joints where the pipe was joined with fittings for bends or

for lateral connections. Wilburn was put to considerable expense in digging up the pipe, refilling and reblocking the connections, and back filling. He sued the appellant (hereinafter "Supply Company") for damages, claiming in substance that Supply Company had furnished the wrong kind of gaskets. He also sought recovery for an alleged shortage in the delivery of a quantity of 4-inch pipe. Supply Company answered denying liability, and counterclaimed for some $5,000 representing the balance due on the purchase price of the materials sold to Wilburn. The case went to the jury, which awarded Wilburn $15,000 on his damage claim and $600 on the shortage claim, to be offset by the balance due on the purchase price of the materials as sought in the counterclaim. Judgment was entered accordingly.

Supply Company has appealed, asserting numerous grounds of error. We shall consider first the contention that the proof was not sufficient to establish that the wrong type of gaskets had been furnished.

The "blowouts" occurred in the main 8-inch line, where the pipe made joints with fittings. The pipe and fittings were designed for "push-on" connections in joints, the pipe being pushed into the opening in the fitting. Inside the lip of the fitting there is a groove into which is inserted a rubber gasket which is designed to seal the space between the outer circumference of the pipe and the inner circumference of the fitting, so as to make the joint watertight. Lengths of pipe also are designed to be joined in a similar manner, by use of couplings into which the ends of the pipes are inserted and which have grooves for gaskets.

The evidence shows that there are two standard or common types or brands of *pipe* and pipe gaskets in general use for water lines. One is the "fluid-tite" brand manufactured by Certain-Teed Products Company and the other is the "ring-tite" brand manufactured by Johns-Manville Manufacturing Company. The main difference in the two, as relates to the issue in this case, is that the groove in the coupling in the ring-tite brand is wider than the one in the fluid-tite brand, wherefor the ring-tite gasket is wider than the fluid-tite gasket. The fluid-type gasket also differs in that it has a series of small holes or indentations around its circumference, on the back, designed to make the gasket expand when water enters the pipe so as to make a tighter seal.

As concerns *fittings*, there are numerous brands on the market. However, Certain-Teed and Johns-Manville do not manufacture fittings—their pipes are used with the fittings of other manufacturers. The evidence indicates that, as is the case with the pipe, there are two types of fittings commonly in use; one with grooves designed for ring-tite gaskets and the other with grooves designed for fluid-tite gaskets. The trouble in the instant case arises out of the fact that Supply Company furnished to Wilburn a relatively new type of fitting manufactured by Ductile Iron Company of America which is claimed by the manufacturer to have a "common groove" suitable for accommodation of *either* the ring-tite or the fluid-tite gasket. The groove in this fitting is of comparable width to that in the exclusively ring-tite fittings but the manufacturer claims that by reason of careful machining and the use of ductile iron the groove will properly handle the narrower fluid-tite gasket.

The specifications for the construction job did not specifically cover gaskets, and were somewhat ambiguous as to fittings. They provided that "Cast Iron Fittings * * * shall be short body mechanical joint, ring-tite joints or fluid-tite joints * * *." Supply Company maintains that this meant that the use of either type of gasket would be acceptable, while Wilburn argues that it meant that ring-tite gaskets should be used with ring-tite fittings, and fluid-tite gaskets with fluid-tite fittings. We shall have more to say about this later.

For his use on the Quicksand job, Supply Company supplied to Wilburn *fluid-tite*

*pipe couplings* and *gaskets* manufactured by Certain-Teed, and ductile iron *fittings* manufactured by Ductile Iron Company. Included were some 4-inch and 6-inch sizes as well as the 8-inch size for the main line. However, the leaks or "blow-outs" complained of occurred only in the 8-inch joints.

We shall summarize the evidence (including inferences) designed to prove that the fluid-tite gaskets were not fit for the purpose for which they were intended to be used. First is the fact that 35 leaks or blow-outs developed, and that they occurred only in the 8-inch fitting joints— not in any of the coupling joints nor in any of the joints using smaller pipe. It is plain that the blow-outs were due either to the furnishing of the wrong kind of gaskets or to faulty installation by Wilburn. The fact that leaks did not occur in any of the coupling joints or in any of the joints using smaller pipe indicates that Wilburn's installation work generally was proper. It would be a strange coincidence indeed if there turned out to be faulty installation in practically every 8-inch fitting joint but none in the 8-inch coupling joints. Particularly is this so since the possible faulty installation suggested by appellant as having occurred would consist of failure to properly lubricate the pipe before making the joint, getting dirt in groove, and similar things that could happen with couplings or with joints using smaller pipe.

Second, is the evidence that literature put out by Certain-Teed, describing its fluid-tite pipe and gaskets, carried a prominent warning that when assembling fittings to fluid-tite pipe "Make Sure You Use FLUID-TITE Gaskets in all fittings and valves having FLUID-TITE grooves * * RING-TITE rings in all fittings and valves having RING-TITE grooves." This was an indication by the pipe and gasket manufacturer that there were two separate types of grooves in use, each requiring a different gasket, and there was no recognition of such thing as a common groove.

Third, is the fact that the specifications, in providing for the use of either ring-tite joints or fluid-tite joints, obviously were not referring to the *gaskets* alone, because surely it was not intended that fluid-tite gaskets could be used with a groove designed exclusively for a ring-tite gasket. The specifications clearly mean the word "joint" to cover both the groove and the gasket and they, like the Certain-Teed literature, do not seem to recognize the existence of a common groove.

Fourth, there is the testimony of two witnesses (one a graduate engineer) with considerable experience in the water main field, that the fluid-tite gaskets are too narrow and too soft and pliable to operate properly in the kind of groove that is in the Ductile Iron Company fittings; that they could be forced out of the groove by the pressure of the water.

Fifth, there is the testimony of Wilburn that after he brought the attention of Supply Company to the leaks or blow-outs, a representative of Supply Company brought him a supply of ring-tite gaskets and suggested that he use them; he did use them and had no trouble with leaks or blow-outs where they were used.

■ It is our opinion that the evidence above summarized had sufficient probative force, standing by itself, to create a jury issue as to the fitness of the fluid-tite gaskets for the intended purpose. The only question is, then, whether the evidence for Supply Company, of the fitness of the gaskets, was so overwhelming as to destroy the probative value of Wilburn's evidence. We think it was not. The main thing relied upon by Supply Company is the evidence of the president and designing engineer of Ductile Iron Company that their fitting was designed with a common groove in which either the fluid-tite gasket or the ring-tite gasket properly could be used. We are not convinced that this testimony was so strong that the jury had to accept it over the other evidence in the case. Particularly is this so when it is

considered that the Ductile Iron Company fittings had been designed only about one year before being used on the Quicksand job, and they did not have any substantial experience of satisfactory use with fluid-tite gaskets. There was evidence of such use on some other jobs but the evidence was in generalities and did not establish such similarity of conditions and extent of use as to be conclusive.

It is our conclusion, then, that upon the evidence as a whole there was a jury issue as to the fitness of the fluid-tite gaskets for the intended purpose.

■ The appellant argues that Wilburn pitched his case in his initial pleadings on fraud and misrepresentation; that there was an entire failure of proof of fraud or misrepresentation; and that the trial court erred in permitting Wilburn to amend his complaint, after all the proof was in, to allege a breach of implied warranty of fitness. Appellant claims it was prejudiced in its defense by the change in theory of the action. In our opinion there was no prejudice and no real change in theory. Throughout the trial the evidence was directed to the issue of whether the fluid-tite gaskets properly would work in the Ductile Iron fittings. Everyone seemed to understand the issue and we find no indication that the appellant was misled as to what kind of a defense it should prepare.

■ The appellant complains of error in the instructions in the failure to define "ordinary care" as related to whether Wilburn was negligent in installing the joints. As hereinbefore indicated, the issue in the case was simply whether the leaks were due to use of the wrong gaskets or to improper installation. Negligence really had nothing to do with it and we think the failure to define ordinary care was of no significance. In connection with this point the appellant argues that there should have been an instruction on Wilburn's duty to investigate and inquire as to whether the fluid-tite gaskets were suitable, upon doubts having arisen in his mind as to their suitability. In our opinion the evidence did not warrant such an instruction. There is no evidence of such facts as should have put Wilburn on inquiry, before completion of installation of the joints, as to the suitability of the gaskets.

■ The appellant suggests that since its contract with Wilburn contained an express warranty of material and workmanship of the goods furnished, with liability being restricted to replacement cost and with a provision that "no claim for labor or damages will be allowed," appellant's liability is limited to the cost of replacing the gaskets. There is no merit in that argument. Liability here is predicated on an implied warranty of fitness and the language in the contract as to express warranties was not sufficient, under KRS 355.2–315 and 355.2–316, to exclude the implied warranty. Consequential damages are recoverable for a breach of implied warranty of fitness. KRS 355.2–715.

■ The appellant complains that the proof as to some of the items of damage claimed by Wilburn was not competent or sufficient; that the damage claims were exaggerated and inflated; and that the instructions gave the jury no guide or standard in measuring damages. The damages awarded were some $5,000 less than undertaken to be established by Wilburn's proof and in our opinion the proof and the instructions were adequate to justify the actual recovery.

■ Finally, we come to the matter of the recovery for the alleged shortage in the delivery of a quantity of 4-inch pipe. Wilburn based his claim of shortage on the fact that the weight shown on the bill of lading covering the truck shipment in which the pipe was supposed to have been delivered was short of the weight that the listed quantity of pipe would amount to, and on the fact that in completing the job at Quicksand the 4-inch pipe was short in quantity, of the amount that had been estimated as necessary for the job, by the same amount as his computed shortage on

the truck delivery above mentioned. While this proof was not of the highest quality it is the opinion of the court that it was enough to sustain the verdict.

The judgment is affirmed.

All concur.