The SINGER COMPANY, a corporation, Appellee,

v.

E. I. du PONT de NEMOURS AND COMPANY, a corporation, Appellant.

No. 77–1438.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1978.

Decided June 6, 1978.

Rehearing Denied July 13, 1978.

Richard D. Shewmaker, of Thompson, Walter, Shewmaker & Gaebe, St. Louis, Mo., for appellant; John B. Carothers, III, St. Louis, Mo., and Eugene L. Grimm, Wilmington, Del., on brief.

Robert B. Hoemeke of Evans, Hoemeke, Casey & McGhee, St. Louis, Mo., for appellee.

Before LAY and HENLEY, Circuit Judges, and HANSON,* Senior District Judge.

HANSON, Senior District Judge.

In this diversity contract action, the Singer Company sued to recover losses incurred when the E. I. du Pont de Nemours and Company allegedly breached both an express warranty and an implied warranty of fitness in failing to provide plaintiff with suitable industrial paint for its plant operations at Red Bud, Illinois. The case was submitted to a jury only on the implied warranty theory, and judgment was returned for Singer in the amount of $108,367.00. Defendant was awarded no recovery on either of its two attendant counterclaims. Du Pont unsuccessfully moved for judgments notwithstanding the verdict and for new trial, contending that the trial court improperly instructed the jury and that there was insufficient evidence to support the jury verdicts. Du Pont appeals from those rulings. We affirm.

Singer became interested during late 1972 in obtaining an electrodeposition paint system for its Red Bud, Illinois plant, where until this time the metal, or ware, used in the manufacture of air-conditioners and furnaces had been painted in a spray system. Electrodeposition is a method of painting by which pretreated ware is conveyed through an electrically charged paint tank and the ware, serving as an anode, is coated with paint in an electroplating type of process. After a period of negotiation between representatives from the two parties, Du Pont, in September and October of 1972, was contracted to provide Singer with paint for its approximately 22,000 gallon tank. Three additional companies were contracted to provide other interrelated steps in the overall finishing process, steps such as pretreatment of the ware and conveyance of the ware through the entire system.

From the beginning, in October of 1973, Singer experienced problems with the electrodeposition system. Ware frequently emerged from the paint tank with "blotches" and "streaks." Repainting was necessary. Du Pont, which supervised the installation and starting up of this electrodeposition system, tried unsuccessfully for six months to correct this problem. Finally, in April of 1974, the Du Pont paint was removed from the tank and replaced with paint supplied by the Sherwin-Williams Company. This lawsuit was filed the following year.

The nub of the factual controversy in the trial court was the cause for the blotches and streaks on the painted ware. Du Pont maintained that the problem was with the substrate, pretreated ware; Singer, however, insisted that the paint was at fault. In countering Singer's claim, Du Pont argued that the paint provided to plaintiff met contract specifications until the substrate was altered in February of 1974, at which time Du Pont could no longer be held to have expressly warranted its product. Singer contends that even if the specifications of this express warranty were met, Du Pont had given an implied warranty of fitness for a particular purpose by representing throughout the period in question that its paint would satisfy plaintiff's needs. Over Du Pont's objection, the trial court instructed the jury on implied warranty for a particular purpose. The issue of express warranty was not submitted.

## I. The Uniform Commercial Code

■ While disagreeing on whether the trial court should have instructed as to an implied warranty of fitness for a particular purpose, the parties were properly in accord that the Illinois adoption of the Uniform

---

* The Honorable William C. Hanson, Senior District Judge, Southern District of Iowa, sitting by designation.

Commercial Code[1] governs the disposition of this case. *Klaxon Co. v. Stenor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Havenfield Corporation v. H&R Block*, 509 F.2d 1263 (8th Cir. 1975). There is also no dispute that the "all tests" provision of the contract, which specified such set standards as color and texture that the paint was to satisfy upon pretreated laboratory test panels, was an express warranty pursuant to Section 2–313(1)(b) of the U.C.C.[2] But Singer claims that the contract further preserved an implied warranty of fitness, a warranty that pursuant to Section 2–315[3] assured plaintiff the paint supplied would satisfactorily cover its substrate. A paragraph in the contract provided:

> None of the provisions or remedies herein are in lieu of any claims for damages Buyer may have at law or equity under the Uniform Commercial Code or otherwise, for the breach of any contracts or warranties with Buyer, which rights are specifically reserved by Buyer.

Du Pont contends that parties who have an express warranty regarding a contracted for item cannot also have an implied warranty of fitness for that same item. The warranty of fitness for a specific purpose is alleged to have been limited by expressly defining it in a set of specifications, and Du Pont claims that to find otherwise would permit Singer to escape the parties' true contractual bargain.

Pertinent sections of the U.C.C., and the comments pursuant thereto, lend inferential support to Singer's position that the implied warranty of fitness was cumulative to and not excluded by the express warranty. Section 2–316(2), with regard to the exclusion or modification of such warranties, states:

> . . . [T]o exclude or modify any implied warranty of fitness the exclusion must be a writing *and conspicuous.* (Emphasis added.)

Comment 9 to that section provides in part:

> The situation in which *the buyer gives* precise and complete *specifications to the seller* is not explicitly covered in this section, but this is a frequent circumstance by which the *implied warranties may be excluded.* The warranty of fitness for a particular purpose would not normally arise since in such a situation there is usually *no reliance on the seller by the buyer.* (Emphasis added.)

*See also* U.C.C. § 2–315, comment 2. Because the evidence in this case fully indicates that it was not the buyer but the seller who in fact recommended and supplied the paint specifications, and remained in control of the paint tank, it would appear that the trial court did not err in its determination that an implied warranty of fitness was at issue. This is especially so in view of the purported exclusion of this warranty, which could be scarcely termed "conspicuous."

A reading of the U.C.C. to suggest that an express warranty and an implied warranty of fitness are not necessarily mutually exclusive, as Singer has argued, receives support from Code authority.

> The fact that a warranty of fitness for a particular purpose does or does not exist has no bearing on any other warranty or theory of product liability. Conversely, the fact that there may be some other basis for liability of the defendant does not preclude the existence of a warranty

---

1. The Uniform Commercial Code is Chapter 26, Ill.R.S. We shall cite sections by their U.C.C. section numbers, omitting the chapter numbers. With the exception of a few sections not herein applicable, Illinois has adopted the 1972 text and comments to the U.C.C.

2. Section 2–313(1)(b) provides:
 (1) Express warranties by the Seller are created as follows . . . . .
 (b) Any description of the goods which is made part of the bargain creates an express

warranty that the goods shall conform to the description.

3. Section 2–315 of the U.C.C. provides:
 Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified . . . an implied warranty that the goods shall be fit for such purpose.

for a particular purpose. *Thus the fact that there is a warranty of conformity to sample [an express warranty] does not preclude the existence of a warranty for a particular purpose.* (Emphasis added.) Anderson, *Uniform Commercial Code* § 2–315:5 (1970).

*See also* White and Summers, *Uniform Commercial Code* § 12–7 (1972); 67 Am. Jr.2d Sales § 501 (1973). Relevant case law, in the balance, further indicates that an express warranty would not control under the circumstances of this case.

Cases can be found prior to the adoption of the U.C.C. to support Du Pont's argument of mutual exclusiveness. This Court, without specific adoption of the position, recognized in *Hercules Powder Co. v. Rich*, 3 F.2d 12 (8th Cir. 1924) that there was law to the effect that an implied warranty of fitness could not prevail in the presence of an express warranty on the same item or subject.

> An express warranty excludes an implied warranty relating to the same subject or of the same general nature, on the theory that no warranty should be implied where the parties with relation to the very same subject have expressed by words the warranty by which they will be bound. *Id.* at 18.

There was also case law to the contrary. *See, e. g., Davenport Ladder Co. v. Edward Hines Lumber Co.*, 43 F.2d 63 (8th Cir. 1930); *George E. Pew Co. v. Karley & Titsenor*, 168 Iowa 170, 150 N.W. 12 (1914). But while there may have once been a split of authority, we fail to find since the general adoption of the above-quoted sections of the U.C.C. any case holding directly in favor of Du Pont's mutual exclusivity agreement. *See* 67 Am.Jur.2d, *supra* at 679. In fact unless the exclusion of the implied warranty of fitness is specifically and conspicuously excluded, courts, often relying upon Section 2–317,[4] have found that such implied and express warranties can be cumulative and co-exist within the same

agreement. *Multivision Northwest, Inc. v. Jerrold Electronics Corp.*, 356 F.Supp. 207 (N.D.Ga.1972); *Murray v. Kleen Leen, Inc.*, 41 Ill.App.3d 436, 354 N.E.2d 415 (1976); *Water Works & Industrial Supply Co. v. Wilburn*, 437 S.W.2d 951 (Ky.1969).

Du Pont, in arguing the law upon appeal, relies principally upon two types of cases that have arisen under the U.C.C.: those in which there has been a showing that the buyer, in possession or control of the item, failed to follow the express warranty specifications; and those where an enforceable disclaimer of an implied warranty has been established. With respect to the first type of case, it is clear that the trial court did not confront a situation where a buyer in possession or control of an item failed to follow seller's specifications, used the item in a manner for which it was not intended, lost that for which he had contracted, and then erroneously claimed a breach of an implied warranty for fitness. *Mustang Fuel Corp. v. Youngstown Sheet & Tile Co.*, 516 F.2d 33 (10th Cir. 1975); *Beall Pipe & Tank Corp. v. Shell Oil Co.*, 370 F.2d 742 (9th Cir. 1967); *Whitin Machine Works v. United States*, 175 F.2d 504 (1st Cir. 1949); *Layne-Atlantic Co. v. Koppers Co.*, 214 Va. 467, 201 S.E.2d 609 (1974). Here, Du Pont, as the seller, was in control of the disputed item. No one denies that Du Pont was throughout this time in control of Singer's paint tank, directing its operation and determining its contents.

The disclaimer cases are likewise inapplicable. Even without a paragraph in the contract reserving all further warranties under the U.C.C., Du Pont would have difficulty in arguing that an express warranty of the paint effected a disclaimer of any further warranty. It is clear from these cases that disclaimers under the Code are not favored and are limited whenever possible. *Admiral Oasis Hotel Corp. v. Home Gas Industries, Inc.*, 68 Ill.App.2d 297, 216 N.E.2d 282 (1965); *Dobias v. Western Farmers Association*, 6 Wash.App. 194, 491

---

**4.** Section 2–317 of the U.C.C. provides in part:

Warranties whether express or implied shall be construed as consistent with each other and as cumulative . . ..

P.2d 1346 (1971); Annot., 73 A.L.R.3d 248 (1976).[5]

■ Du Pont also argues in general that to permit Singer to assert an implied warranty of fitness would be to allow ultilization of the U.C.C. in avoidance of the parties' true bargain. The true bargain, through, is less than apparent from the face of the contract. This was not a situation where a buyer ordered according to specifications and then claimed an implied warranty of fitness when the product failed to measure up to expectations. In this instance, the buyer approached the seller describing the results desired and the seller professed to be able to supply it, thereby inducing a reliance that created the possibility of an .implied warranty of fitness. Notwithstanding the express warranty contained within the specifications particularly defining and describing the item to be supplied, there may have been a further warranty that an item with those specifications would accomplish certain results or be adequate for the specified purpose. That is, the accomplishment of the purpose might be viewed as the essence of the contractual undertaking, and not the mere furnishing of the specified item. Nothing within this contract, or in writings or statements subsequent to it, indicate whether the end of the agreement was the specified item or the use for which the item was intended. *Cf. Construction Aggregates, supra.*

Du Pont simply failed to negotiate a contract that clearly delineated and limited allocation of risk. This case would never have arisen had defendant, as a party to and a scrivener of the contract, either inserted a specific disclaimer or demanded that the warranty savings clause be deleted.

■ Having left the contract ambiguous, the question as to whether use rather than supply of the product was intended to be of the essence, as well as questions regarding buyer's reliance and seller's knowledge of that reliance, are for jury determination. Such were submitted to the jury in this case under the trial court's following instruction.[6]

Your verdict on the plaintiff's claim must be for the plaintiff if you believe:

First: The defendant sold paint to the plaintiff.

Second: The defendant knew the use for which plaintiff purchased the paint, and

Third: Plaintiff reasonably relied upon defendant's judgment for the suitability of the paint for such use, and,

Fourth: The paint was not suitable for such use, and

Fifth: As a direct result plaintiff was damaged.

Du Pont contends on appeal, as it did below, that the trial court was in error giving an instruction which allowed the jury to determine the construction of the contract. The question regarding the presence of an implied warranty, defendant maintains, constituted a question of law that should have been determined by the trial judge. Moreover, it is claimed that the jury should have been instructed with respect to the express warranty.

■ The better rule, when there remains an issue of contractual intent, is to submit the issue to the jury unless the evidence is so clear that no reasonable person would determine the issue but one way.

---

5. When dealing with disclaimers, some courts, pursuant to U.C.C. § 1–201(10), have looked to the "conspicuousness" of such disclaimers and construed any possible ambiguity in intent or content against the seller. *Construction Aggregates Corp. v. Hewitt-Robins, Inc.*, 404 F.2d 505 (7th Cir. 1968); *Boeing Airplane Co. v. O'Malley*, 329 F.2d 585 (8th Cir. 1964). The buyer, these courts reason, should not be subjected to surprise. U.C.C. § 2–316, comment 1; *Tennessee Carolina Transp., Inc. v. Strick Corp.*, 283 N.C. 423, 196 S.E.2d 711 (1973). Hence, if

there is either doubt as to the intent of the parties, or an unnegotiated reliance by buyer upon seller's representations, the disclaimers are not enforced. *See generally*, Annot., 83 A.L.R.2d 636 (1978).

6. This instruction, with minor alteration, is pattern instruction 25.03 of the Missouri Approved Instructions. Neither party objected to the form of the instruction, apparently agreeing that there would be no significant difference in a comparable Illinois instruction.

440

*Rankin v. Fidelity Trust Co.*, 189 U.S. 242, 23 S.Ct. 553, 47 L.Ed. 792 (1903); 3 Corbin, *Contracts* § 554. Du Pont fails to offer any sustaining reason as to why the construction of an ambiguous contract, which involves the existence or nonexistence of an implied warranty of fitness under the U.C.C., should also not be left to a jury determination. Anderson, *Uniform Commercial Code*, § 2–315:26; *Gillette Dairy, Inc. v. Hydrotex Industries, Inc.*, 440 F.2d 969 (8th Cir. 1971). The question of buyer's reliance and seller's knowledge of that reliance is a factual inquiry particularly well-suited for jury deliberation. U.C.C. §§ 2–316, 2–317; *Construction Aggregates, supra; Janssen v. Hook*, 1 Ill.App.3d 318, 272 N.E.2d 385 (1971); *Catania v. Brown*, 4 Conn. Cir. 344, 231 A.2d 668 (1967).

■ There was no prejudicial error in refusing to instruct the jury with respect to the express warranty. As concluded above, the law is that an implied warranty of fitness is not necessarily excluded by the presence of an express warranty. Thus, satisfaction of the express warranty, a factual issue that could be and was argued to the jury, would not preclude the jury from further consideration of the alleged implied warranty. We note that defendant, in presenting its appeal, did indicate that its primary purpose in requesting the express warranty instruction was to implement this mistaken contention that no implied warranty could be present by the fact that it had been specified and those specifications met. Plaintiff, while not conceding that the express warranty had been satisfied, agreed to go to the jury on the issue of implied warranty alone.

## II. Substantial Evidence

■ Once having determined that the issue of implied warranty was properly submitted to the jury, sufficiency of the evidence becomes the controlling inquiry. We review the evidence to determine whether there was sufficient evidence for the jury to find that Singer reasonably relied upon Du Pont's judgment regarding the suitability of the paint, that Du Pont knew the use for which Singer purchased the paint, and that the paint was not suitable for such use. On appeal, Du Pont does not appear to contest the interrelated issues of buyer's "reliance" and seller's "knowledge." In view of the extensive negotiations prior to the contract, Du Pont's supervision of the installation of the paint tank, and the continuing presence of Du Pont in a supervisory capacity throughout the period in question, defendant's reason for not pursuing these lines of argument is apparent. Du Pont does contend, however, that there is insufficient proof to show that the paint was not suitable for Singer's use and was the cause of the blotches and streaks on the painted ware. It insists that an uneven pretreatment, with resulting un-uniform substrate, was the source of the problem.

At this point it should be noted that there is some question as to what constituted suitable use under these circumstances. Singer obstensibly argues that Du Pont impliedly warranted its paint to cover any substrate, regardless of the quality of that substrate. If this were so, then apparently the paint would be at fault irrespective of how un-uniform the substrate. The mere fact that the paint failed to cover without blotches or streaks would alone be sufficient proof of unsuitable paint, and plaintiff's case against the defendant would need proceed no further. While noting that perhaps an element of "reasonableness" must be read into the "suitable for use" requirement, we need not address this question. It is our opinion that the evidence is sufficient to establish that the paint, and not a significantly un-uniform substrate, was the cause of the contested blotches and streaks.

■ In reviewing the evidence on a motion for judgment n. o. v., a court must give the party securing the jury verdict the benefit of all reasonable inferences to be drawn from the evidence. *Griggs v. Firestone Tire & Rubber Co.*, 513 F.2d 851, 857 (8th Cir. 1975). The verdict, however, must be supported by substantial evidence; a mere scintilla is not enough. *Simpson v. Skelly Oil Co.*, 371 F.2d 563, 568 (8th Cir.

1967). In making that determination, the record must be examined and the testimony reviewed without assigning credibility or weight to the witnesses and evidence. *Thieman v. Johnson*, 257 F.2d 129, 132 (8th Cir. 1958). A trial court cannot substitute its judgment of the facts for that of the jury, and should grant a judgment n. o. v. " . . . only where the evidence points *all* one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party." *Giordano v. Lee*, 434 F.2d 1227, 1231 (8th Cir. 1970), *cert. denied*, 403 U.S. 931, 91 S.Ct. 2250, 29 L.Ed.2d 709 (1971); *Seven Provinces Ins. Ltd. v. Commerce & Industry Ins. Co.*, 65 F.R.D. 674 (W.D.Mo.1975).[7] An appellate court follows the same standards as the trial court in testing the propriety of a judgment n. o. v. *Schneider v. Chrysler Motors Corp.*, 401 F.2d 549, 555 (8th Cir. 1968).

When presenting its evidence to the jury, Du Pont focused upon the pretreatment of the ware, a rather complicated seven-stage process which was done both for the purpose of deterring corrosion of the metal and to improve its adhesive composition for the paint. Du Pont had contracted to deal with two types of Singer substrate: iron phosphated cold rolled steel and galvanized steel coated at the mill with zinc phosphate. During contract negotiations, Du Pont had expressed concern regarding the type of substrate to be used in the electrodeposition system and had spent time attempting to determine which paint would coat most satisfactorily. Initial problems in obtaining a satisfactory painting of the substrate were not denied, but Du Pont argues that these problems, which could be attributed to conveyor line stoppage and other such parts of the total process for which it was not responsible, were nearly resolved when Singer decided to change one of the two substrates. At the recommendation of Amchem, the corporation then in charge of the pretreatment process, the pretreatment of cold rolled steel was changed from iron phosphate to zinc phosphate. Du Pont was not consulted. Nonetheless, defendant thereafter continued to experiment with the paint formulation in an effort to overcome the blotching and streaking problem.

Du Pont, whatever the substrate, has persistently maintained that the problems with the painted ware could be traced to the pretreatment prior to the electrodeposition. It claims to have shown a number of problems with this part of the system. However, the major problem, and the primary reason for the blotches and streaks of which Singer complained, was purportedly the uneven application of phosphate during the pretreatment process. While the people in charge of pretreatment not unexpectedly denied it, the uneven phosphating, which could affect the gloss of the paint, is said to have further varied the color. Du Pont offered into evidence laboratory test panels, test substrate used under the contract because of its supposedly uniform pretreatment, and these particular painted panels were without blotches or streaks. Moreover, also offered was eyewitness testimony that there was an observable correlation between blemished ware before pretreatment and blemished ware after pretreatment.

Singer neither disputed the complexity of the entire system nor that mutual compatibility within the system, which Du Pont sought to achieve during the "debugging" stage, was difficult to achieve. Particularly complex, Singer attempted to point out in its evidence, was electrodeposition, as such variables in the paint tank as current, circulation, temperature, and solvent levels had to be properly balanced. That balance was allegedly never maintained. Testimony elicited indicated that while pretreatment adjustments had to be made, those adjustments, unlike those made in the paint tank, were controllable and far less frequent. Further testimony from Singer employees evidenced that, regardless of the particular type of pretreatment, there was no pattern to the occurrence of blotches and streaks

---

7. Neither party has suggested that the test for the sufficiency of evidence is other than the "substantial evidence" test utilized in the federal courts. *See Harwell v. Westchester Fire Ins. Co.*, 508 F.2d 1245 (8th Cir. 1974).

during the six-month period, and that the blotches and streaks had in fact been a problem since Du Pont's initial demonstration of the electrodeposition system to Singer during contract negotiations. At the time of the demonstration and before the contract was finalized, Singer was allegedly assured that the blotches and streaks would not be a problem. Nor did Du Pont at any time, even after the change in substrate, suggest that its paint would be unable to cover Singer's substrate. Yet, the problem persisted. This was demonstrated to the jury by the offering of a number of other laboratory test panels, which despite their presumed uniform coating of phosphate, did show blotches and streaks after being run through the Du Pont paint bath at various times during the period in question.

Du Pont offered expert testimony in an effort to establish irrefutably that the cause of the blotches and streaks was an uneven pretreatment of the ware. Clayton A. May, an expert in electrodeposition, testified for defendant that the problem was either with the metal or with the pretreatment of that metal. To bolster this opinion, Du Pont also called upon James F. Ficca, head of an independent analytical service laboratory that had conducted tests upon the painted substrate. Ficca testified that several microstructure studies of painted substrate from this period showed an uneven coating of phosphate. Defendant concluded that these studies established that the problematic blotches and streaks were owing to the substrate and not the paint, which was only uneven in its covering because of the underlying un-uniform surface to which it was being applied.

Much of Du Pont's scientific argument is directed to discrediting the testimony of plaintiff's expert, John M. De Vittorio. De Vittorio's testimony was that impurities and non-uniformity of elements within the paint tank were the source of the blotches and streaks. Claiming that the paint tank was undergoing change, a change by which the resin breaks down into impurities through hydrolysis, De Vittorio, as defendant recounts his opinion, believed that the blotches or streaks were caused in part by impurities co-depositing on the ware. But Du Pont asserts that such an opinion is erroneous. First, it allegedly ignores ultrafiltration, a process created and utilized in the Singer tank to prevent hydrolysis. De Vittorio also indicated in cross-examination that the impurities were evenly distributed throughout the tank, which defendant claimed is inconsistent with the suggestion that they co-deposited to form the blotches and streaks. In fact, notwithstanding the arguments of plaintiff's counsel, Du Pont contends that De Vittorio never actually stated there was non-uniformity of the paint solution in the tank, but only that the composite particles had changed so that the paint solution was out of balance throughout the tank. The foundation for this testimony is challenged. De Vittorio conceded that his opinion was primarily based upon his reading of daily paint logs kept during the period, which indicated when certain unknown coded additives were put into the paint tank. From the mere frequency and amount of such additives, defendant contends De Vittorio could not have reached his conclusion that the paint tank was of a "non-homogeneous" nature.

Du Pont did not seek to disqualify De Vittorio as an expert. Nor, in view of his extensive work in the field of electrodeposition, it is likely De Vittorio could have been so disqualified. Rather defendant unsuccessfully moved to strike his testimony, contending that De Vittorio's expert opinion was unsupported speculation that was improper for jury consideration. *Galloway v. United States*, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943); *United States v. Hill*, 62 F.2d 1022 (8th Cir. 1933).

 The trial court did not commit any error in overruling Du Pont's motion to strike the testimony of plaintiff's expert. Du Pont's attack upon De Vittorio's testimony must be viewed in the light of the new Federal Rules of Evidence regarding expert testimony. Fed.R.Evid. 702 *et seq.; see Twin City Plaza, Inc. v. Central Surety & Ins. Corp.*, 409 F.2d 1195 (8th Cir. 1969). While an opinion still "rises no higher than

the level of the evidence and the logic upon which it is predicated," it is now for the jury, with the assistance of vigorous cross-examination, to measure the worth of the opinion. *Hill, supra* at 1025; *see Polk v. Ford Motor Co.,* 529 F.2d 259 (8th Cir. 1976). The jury here, as its province permits, apparently disagreed with Du Pont's assessment of De Vittorio's expert opinion. *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16 (5th Cir. 1974), *cert. denied,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974).

Moreover, we too do not find De Vittorio's opinion to be mere theory, wholly void of a factual or rational basis. *Beall Pipe, supra* at 744. Despite defendant's claims, evidence of sediment at the bottom of the tank, and a layer of pigment at the top, indicates that the paint may have been non-uniform and so might co-deposit in blotches and streaks. Nor is it without reason that one as De Vittorio, who has patents on various aspects of electrodeposition, has examined some 75 such systems, and has set up a system for the Sherwin-Williams Paint Company, might conclude from his practical experience that the frequency and number of additives to Singer's paint tank indicated difficulty in keeping the paint tank "homogeneous"—that is, keeping the various elements and particles in proper proportion to one another. Du Pont's extraction of 440 gallons of paint from the Singer tank for testing further suggested to De Vittorio, from his own experience, that even Du Pont had doubts as to the paint formulation. Then too, Du Pont never was able to account for blotches and streaks on the painted test panels.

Although defendant goes to some length to suggest that De Vittorio's opinion is without any logical basis, we note that his opinion and that of the defendant's expert were in some respects similar. Both testified, as did other witnesses, that a chemical process occurs during electrodeposition in which the paint reacts with the substrate, dissolving it to a certain extent. De Vittorio's opinion was that if the paint is out of balance, non-homogeneous, then the substrate undergoes more extensive dissolution and is dissolved to the extent that the base metal shows through in the form of blotches and streaks. He testified:

> . . . [T]he difference [is] in the way in which a coating would be deposited from a homogeneous bath as opposed to non-homogeneous bath, the sensitivity of the paint for the variation in substrate being greater for the bath that's non-homogeneous than for the bath that is uniform and homogeneous in character.

So while plaintiff's expert might agree that the pretreatment of the ware was to some extent un-uniform, it was sufficiently uniform that in his opinion a good industrial paint would have covered the substrate. The paint and not the substrate was, in his opinion, the cause of the blotches and streaks.

De Vittorio further took issue with defendant's micron studies, believing that the area examined was too small to yield proof that the substrate was at fault. There was also some confusion with regard to the source and location of the titanium, the operative trace element in the study. While De Vittorio was not an expert on pretreatment, neither by admission was May, Du Pont's expert. Though De Vittorio, from his observation of paint tank additives, may have proceeded on the basis that something was wrong with the paint, May, from a series of charts, proceeded on the assumption that the paint was well-mixed and in proper proportions. Defendant offered no further proof to support this assumption.

Also introduced at trial was evidence of events subsequent to the removal of the Du Pont paint from the tank. Du Pont's paint was replaced with Sherwin-Williams paint, and Singer offered evidence to show that the problem of blotching and streaking was thereby solved to the extent that repainting operations were discontinued. Evidence further indicated that Du Pont no longer sells the type of paint marketed to Singer. By way of evidence from another independent analyst, Du Pont did attempt to counter this evidence by purportedly showing that the pretreatment system and resulting

substrate were considerably altered at the time of the Sherwin-Williams paint was put into the tank. This allegation was not admitted to by those in charge of the pretreatment process.

### III. Conclusion

■ In reviewing the evidence pursuant to the judgment n.o.v. standards, we cannot conclude that Singer failed to offer the necessary evidence to sustain a jury verdict against Du Pont for a breach of an implied warranty of fitness. Clearly, Du Pont, which reviewed the entire finishing system, knew at the time of contracting the particularized use for which plaintiff purchased the paint, and Singer reasonably relied upon Du Pont's judgment that its paint was suitable for the electrodeposition system. Du Pont makes some argument that the change in substrate affected the suitability, but it was an argument not pressed upon appeal. In any event, if defendant did not consider itself bound by warranty to do anything more than furnish a paint of particular specifications, we find it difficult to explain not only why Du Pont supervised the installation of the system, but worked to alleviate the problems during the entire period its paint was in the tank.

Finally, in satisfaction of the last element necessary to an implied warranty of fitness, the evidence was sufficient to show that Du Pont's paint was not suitable for Singer's use. The evidence here presents a close question. Yet giving the "jury verdict the benefit of all reasonable inferences to be drawn from the evidence," this Court, though we might have cast our verdict otherwise, cannot say there was no more than a scintilla of evidence to support the jury verdict. The testimony of Singer employees and De Vittorio, and such evidence as the unexplained blotches and streaks upon the laboratory test panels, sufficiently takes this case from the undeterminative equipoise for which defendant argues. *Massachusetts Protective Ass'n v. Mouber,* 110 F.2d 203 (8th Cir. 1949); *Antilles Shipping Co. v. Texaco, Inc.,* 321 F.Supp. 166 (S.D.N. Y.1970); *but see Lewis v. Mobil Oil Corp.,*

438 F.2d 500 (8th Cir. 1971); *Twin City Plaza, supra* at 1203.

■ With respect to damages, which were reasonably assessed, we find the trial court did not err in denying a judgment n.o.v. on Du Pont's counterclaim for paint sold and delivered or further counterclaim for value of services rendered. Nor did the trial court abuse its discretion in denying defendant's motions for new trial.

The judgment appealed from is affirmed.