605 F.2d 412
 1979-2 Trade Cases 62,831
 CA 79-3367 REFRIGERATED FOOD LINE, INC., a corporation, Van
Gover, Kenneth Johnston, Tom A. Kretsinger, M. G. Rippey,
Warren H. Sapp, William H. Tate and Howard Wood, as
statutory trustees for Refrigerated Food Line, Inc., a
corporation, Appellants,
v.
REPUBLIC INDUSTRIES, INC., Riss International Corporation,
and World Leasing, Inc., Appellees.
 No. 79-1062.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 18, 1979.
Decided Sept. 11, 1979.
Rehearing Denied Oct. 1, 1979.
 
 Max Von Erdmannsdorff (on brief), Von Erdmannsdorff, Zimmerman & Shank, Kansas City, Mo., argued, for appellants.
 Lester M. Bridgeman, Bridgeman & Nerenberg, Washington, D. C. (argued), Rodger John Walsh, Kansas City, Mo., on brief, for appellees.
 Before LAY, BRIGHT and HENLEY, Circuit Judges.
 HENLEY, Circuit Judge.
 
 
 1
 This is an appeal by plaintiffs from a final judgment in a private antitrust suit entered in late December, 1978 by the United States District Court for the Western District of Missouri (The Honorable William R. Collinson, District Judge). The claim of the plaintiffs was based on § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Plaintiffs alleged that the defendants had entered into an unlawful conspiracy in restraint of interstate commerce, which conspiracy was directed at the corporate plaintiff, and that as a result of the alleged conspiracy the business of the corporate plaintiff had been destroyed. Plaintiffs sought treble damages, a reasonable attorney's fee and costs as provided by § 4 of the Clayton Act, 15 U.S.C. § 15.[1]
 
 
 2
 The suit was commenced in 1974 shortly after an earlier suit commenced by the corporate plaintiff had been dismissed without prejudice. After much pretrial work-up the case was finally tried to a jury with Judge Collinson presiding on May 22 and 23, 1978. The jury found in favor of the plaintiffs and assessed actual damages in the sum of $600,000.00. Judgment was entered for treble that sum, plus an attorney's fee of $100,000.00. The gross amount of the judgment was $1,900,000.00 plus costs. However, one of the defendants, World Leasing, Inc., had filed a counterclaim against the corporate plaintiff based on a judgment that it had obtained in 1972 in the Circuit Court of Greene County (Springfield), Missouri. When the district court's judgment was entered, the amount of the Circuit Court judgment, including interest, amounted to about $75,000.00, and the amount of that judgment was set off against the judgment that was awarded the plaintiffs by the district court.
 
 
 3
 After that judgment was rendered, the defendants filed a motion for a judgment notwithstanding the verdict (judgment n. o. v.) or, alternatively, for a new trial. On December 29, 1978 the district judge filed an Order amounting to a memorandum opinion granting the basic motion for judgment n. o. v. and conditionally granting the alternative motion for a new trial. Fed.R.Civ.P. 50(b), (c) and (d). A final judgment based on that Order was entered, and the plaintiffs have appealed.
 
 
 4
 The case involves the interstate hauling of perishable meat and meat products from points in the Midwestern States to points in the Southeastern States. Such operations are, of course, subject to the regulatory jurisdiction of the Interstate Commerce Commission (ICC). During the period with which we are concerned, that runs from early 1969 through June 30, 1971, the governing regulatory statute was Part II of the Interstate Commerce Act, frequently referred to as the Motor Carriers Act. 49 U.S.C. § 301 Et seq.[2] At this point we make general reference to that statute and we particularly refer to those sections of it that deal with certificates of public convenience and necessity without which common carriers of freight in interstate commerce cannot lawfully operate. 49 U.S.C. §§ 306-308, as written prior to the 1978 revision of the Act that has been noted.
 
 
 5
 In order to obtain a certificate, referred to in the industry and in this case as an "authority," a carrier must show that there is a public need for the service, and that he is able and willing to supply that need in an efficient and acceptable manner. A carrier who has acquired an operating authority may lose it if he ceases to be able to provide the requisite service to consignors and consignees of goods and commodities.
 
 
 6
 The interstate transportation of goods by motor carrier involves the use of "tractor-trailer rigs" consisting of a self-propelled tractor that pulls a trailer. Where perishable products are involved, the trailers must be refrigerated unless the hauls are to be for very short distances. A carrier holding a certificate from the ICC may operate with his own equipment or he may lease the equipment from others. The lessors may be concerns engaged in the leasing of trucking equipment or independent truckers who own their own rigs.
 
 
 7
 To return to this case, the controversy is between a dissolved Missouri corporation, Refrigerated Food Line (RFL), and its seven statutory trustees in dissolution, as plaintiffs, and three corporations as defendants.[3] From the spring of 1969 until its dissolution on June 30, 1971 RFL was engaged in the interstate hauling of meat in refrigerated trailers into Southeastern States such as Georgia, Alabama and Florida. RFL derived revenue from the initial hauls and also from back hauls of exempt commodities[4] from points of original destination.
 
 
 8
 RFL owned no equipment itself; instead it leased both tractors and trailers from others, including World Leasing, Inc., one of the defendants in the case.
 
 
 9
 It is now time to identify the defendants more closely.
 
 
 10
 World Leasing, Inc. (World) is an equipment leasing concern that operates or operated in Tulsa, Oklahoma. In early and mid-1969 and in prior years it was owned by Earl Lewis and was operated by him and by his brother, John Lewis.
 
 
 11
 The next defendant to be mentioned is Riss International, Inc. (Riss). Riss is engaged in the interstate trucking business, and it hauls both perishable and non-perishable products. The perishable products, including meat, are hauled in refrigerated trailers. Riss, which is located in Kansas City, Missouri, has been in the trucking business since 1927.
 
 
 12
 The third defendant is Republic Industries, Inc. (Republic). That company was formed in 1969 as a holding company, and the stock in it is owned by Mr. Robert Riss of Merriam, Kansas and other members of the Riss family. That family evidently owned the stock in the defendant Riss for many years prior to the formation of Republic. After Republic was formed, it took over the ownership of Riss. Also in 1969 Republic purchased the defendant World. Thus, Republic since 1969 has owned both of the other defendants in the case.[5]
 
 
 13
 As has been observed, Earl Lewis was the President of World prior to the acquisition of that company by Republic and he remained as President after that acquisition and until his discharge and that of his brother John in June, 1970.
 
 
 14
 RFL was not formed as a separate or independent corporation. Rather, "Refrigerated Food Line" is nothing but a change in the corporate name of another corporation, Bilyeu Transports, Inc. (Bilyeu), which was a trucking company operating out of Springfield, Missouri. The name was changed when the investors involved in this case acquired the stock of Bilyeu.
 
 
 15
 Bilyeu was owned originally by Bill Bilyeu, who also owned or controlled other corporations. In late 1968 and early 1969 Bilyeu was in serious financial difficulties, being indebted to the Empire Bank of Springfield in the sum of around $290,000.00, and was behind in its payments to the extent of some $40,000.00. Bilyeu did have some valuable assets consisting of nineteen operating authorities from the ICC authorizing it to haul meat into the Southeastern States. Another corporation owned by Mr. Bilyeu had a limited authority, referred to as "Sub-42," that authorized that company to haul meat from Wichita, Kansas to Springfield and to another point in Missouri. However, that authority stipulated that it could not be "tacked" to other authority permitting the hauling of meat out of Springfield to points in the Southeast.
 
 
 16
 Bilyeu leased equipment from World. That equipment was old, and the rentals charged by World were lower than would have been charged for newer equipment. Additionally, Bilyeu had an understanding with Earl Lewis that Bilyeu would be permitted to become from sixty to ninety days delinquent in paying its rentals to World.
 
 
 17
 In early 1969 Kenneth Johnston and other individuals who appear in this case as plaintiff trustees were interested in forming a trucking company of their own. All of these individuals had some experience in the trucking business. Mr. Johnston conferred with Earl Lewis about the possibility of forming a company, and apparently Lewis suggested that the Johnston group take over Bilyeu and its operating authorities.
 
 
 18
 Johnston and his associates conferred with their Kansas City attorneys, Messrs. Kretsinger & Sapp, and an arrangement was worked out whereby the stock and assets of Bilyeu were acquired, and the corporate name was changed to Refrigerated Food Line. Earl Lewis came into the venture and became the largest single investor, holding 35% Of the stock. He became the Chairman of RFL's Board of Directors, and Maurice Gene Rippey, who had been working for Bilyeu, also invested in RFL and became the President and operating manager of that company.
 
 
 19
 It was understood that World would lease equipment to RFL just as it had leased equipment to Bilyeu, and that the same "credit arrangement" that had existed between World and Bilyeu would continue between World and RFL. Mr. Lewis continued to be the President of World.
 
 
 20
 As consideration for the take-over of Bilyeu by the Johnston group, the latter assumed the indebtedness of Bilyeu to the Bank. Additionally, the members of the group invested $100,000.00 in cash. Of that sum $40,000.00 was used to bring the obligation to the Bank up to date, and the other $60,000.00 was used to purchase interest bearing certificates of deposit, the proceeds of which could be used as working capital as the RFL operation got under way.
 
 
 21
 According to the evidence of plaintiff, the "game plan" of RFL was to start out on a small scale with a relatively few units being leased from World and gradually to expand the operation to the point at which it would have fifty tractor-trailer units on the road. It appears that RFL was particularly interested in hauling meat out of Wichita, and in that connection it purchased the "Sub-42" authorization that has been mentioned.
 
 
 22
 RFL began operations in late March, 1969. Later in that year and without the knowledge of the RFL investors, other than Earl Lewis, World was sold to the Republic holding company. The result of that transaction was, as stated, that Republic became the owner of both the leasing company, World, and the original Riss trucking company. Lewis remained as President of World until he was discharged in the spring of 1970 when the management of Republic learned that he was also the principal stockholder in RFL and Chairman of the Board of that company, and that he had permitted RFL to become seriously behind in its rental payments to World. We will return to that subject presently.
 
 
 23
 The record reflects that for many years the defendant Riss had held certificates authorizing it to haul meat from midwest points to the "East Coast" but that prior to about the late 1960's it had not had authority to haul to the "Southeastern States."
 
 
 24
 In 1969 and possibly prior thereto and on into 1970 Riss at the instance of certain shippers in the Midwest, including shippers out of Wichita, Kansas, began making applications for authority[6] to haul meat into the Southeastern States. Those applications were opposed as a matter of course by other carriers, and RFL was a protestant in connection with some of the applications.[7]
 
 
 25
 In June, 1970 RFL was in possession of eight refrigerated trailers and three tractors that it had leased from World and owed back rentals and other charges as to that and perhaps other equipment amounting to around $50,000.00. In that month and after the discharge of Lewis as President of World, Gale Strother, an employee of Republic, contacted Rippey, as operating manager of RFL, and demanded that the back rentals be paid or that the equipment in possession of RFL be returned, and Rippey was also advised that in the future rental rates on equipment leased by RFL from World would in any event be raised very substantially.
 
 
 26
 Mr. Rippey advised Mr. Strother that RFL could not pay the proposed increased rentals. RFL did not comply with World's demand for payment of back rentals; nor did RFL return the equipment that it had in its possession. Consequently, World commenced a replevin suit in the Circuit Court of Greene County. World claimed that it was entitled to repossess its equipment, that it was entitled to past due rentals and other charges, plus interest, and that it was entitled to damages for allegedly wrongful withholding of possession of its property by RFL. By posting bond World was able to obtain possession of the eleven units that have been mentioned by early July, 1970.
 
 
 27
 RFL defended that suit and filed a counterclaim for damages. The position of RFL seems to have been that the action of World in raising the rates and filing the replevin suit amounted to a breach of a binding contract between RFL and World, acting through Lewis.
 
 
 28
 That case was tried in the Circuit Court and was decided in May, 1972. The Circuit Court held that World was entitled to possession of the equipment and that it was also entitled to judgment for back rentals plus accrued interest. The claim of World for damages for wrongful detention and the counterclaim of RFL for damages were both dismissed. World was awarded a monetary judgment of slightly more than $55,000.00. As will be seen, by the time that judgment was rendered RFL was out of business, and no part of the judgment was paid. It was the amount of that judgment, plus continuing interest, that was set off against the judgment that the district court originally awarded to RFL in this case.[8]
 
 
 29
 There is substantial evidence of record to the effect that in the spring and summer of 1970 the supply of refrigerated trailers available for leasing was limited. There can be no question that RFL was injured to some extent in its business by its loss of the eight trailers and three tractors that it had leased from World, and that it also suffered because it could not replace that equipment at the same rates or on the same payment terms that had prevailed as between RFL and World prior to June, 1970. After the loss of the equipment leased from World, RFL was required to lease additional equipment from others at higher rates and probably without the liberal credit terms extended by Mr. Lewis.
 
 
 30
 The loss of the World equipment, which constituted about a third of the fleet that RFL had on the roads in the first half of 1970, did not put RFL out of business. In fact, during the remainder of its business life RFL had a larger fleet of equipment than it had at the time of the repossession by World of the equipment that RFL had leased from World.
 
 
 31
 RFL continued to operate during the second half of 1970 and during the first half of 1971. However, the operation was not financially successful, and RFL was dissolved as of June 30, 1971.
 
 
 32
 A few months prior to June 30, 1971 RFL filed its antitrust suit against Republic, Riss and World. A substantial pretrial record was accumulated in that case. However, it was dismissed in 1974 after the dissolution of RFL and, as mentioned, was promptly refiled.
 
 
 33
 Plaintiff's theory under § 1 of the Sherman Act is that the defendants conspired to restrain interstate commerce by excluding RFL from competing in the leasing market for refrigerated trailers, that the conspiracy was successful, and that as a result of it the business of RFL wad destroyed.
 
 
 34
 The defendants deny that there is any validity to that theory. Defendants take the position that there was no conspiracy among them in restraint of interstate commerce and that no actions on the part of the defendants, or any of them, were the cause of the business failure of RFL. The position of the defendants is that RFL was underfinanced and that it could not operate without access to equipment rented at unreasonably low rentals and with leave to run behind for a substantial period of time with respect to payment of rentals.
 
 
 35
 As has been said, the case was tried in May, 1978. At the conclusion of plaintiff's case the defendants filed a formal motion for a directed verdict, and they filed a similar motion at the close of all of the evidence. Those motions were denied, and the case was argued and submitted.
 
 
 36
 The trial court gave all of the instructions requested by the plaintiffs; it gave some of the instructions requested by the defendants and denied others. No complaint is made here as to the wording of the particular instructions given.
 
 
 37
 The trial judge told the jury in essence that before it could find for the plaintiff it must find: (1) that the defendants had been guilty of conspiracy to restrain interstate trade and commerce in the manner that has been mentioned; and (2) that the conspiracy, if any, had damaged the business or property of the plaintiff (or plaintiffs as they were at that time).[9]
 
 
 38
 With respect to damages the jury was instructed that if it found for the plaintiff it should award compensatory damages as shown by a preponderance of the evidence; and the jury was told that it might consider lost profits as an element of damage, but that an award of damages could not be based on speculation or conjecture.
 
 
 39
 Perhaps to the surprise of the trial judge, the jury found in favor of the plaintiff, and the judge initially accepted the verdict and rendered judgment thereon, including an award of an attorney's fee. Later, in granting the motion of the defendants for judgment n. o. v., or, in the alternative, for a new trial, the district judge filed a short opinion which we set out here in full.
 
 
 40
 In this antitrust suit the plaintiff corporation contends that its financial failure was due to an unlawful conspiracy between the defendant corporations to restrain trade by excluding plaintiff from competing in the leasing market for refrigerated trailer units. This was the sole issue (a Sherman Act, Section One, violation) upon which plaintiff requested a verdict authorizing instruction.
 
 
 41
 Without summarizing the evidence, or lack of evidence, this Court finds that the plaintiffs wholly failed to make a case on this issue. There was no evidence that after the defendant leasing company replevied its trailers from plaintiff truck line, that there were not a multitude of trailers which could be leased from other owners, and, in fact, plaintiff's own records demonstrated that it thereafter operated a larger fleet of leased trailers than the small fleet it had leased from one of the defendants.
 
 
 42
 This Court would not have submitted this case to the jury except for recent admonitions by the Court of Appeals of this Circuit that, to save judicial time, all doubtful cases should be submitted, and the trial court could then rule on submissibility in passing on post-trial motions.
 
 
 43
 This Court will grant the defendants' motion for judgment notwithstanding the verdict.
 
 
 44
 The defendants have quite properly also filed an alternative motion for a new trial. The Court will grant the alternative motion for a new trial upon the following grounds:
 
 
 45
 1. It was error to admit into evidence and allow plaintiffs' expert to testify from the financial analysis and projections which the expert states was not prepared under any approved or recognized accounting methods.
 
 
 46
 2. It was error to give the plaintiffs' requested instruction authorizing recovery for anticipated lost profits, because there was no evidence from which such damages could be computed without the most flagrant speculation and conjecture.
 
 
 47
 3. The verdict awarding damages in the amount of $600,000.00 was not based on a scintilla of evidence in the case, and was so excessive as to demonstrate bias and prejudice against the defendants by the jury.
 
 It is therefore
 
 48
 ORDERED that defendants' motion for judgment notwithstanding the verdict be, and is hereby, granted; and
 
 
 49
 FURTHER ORDERED that defendants' alternative motion for a new trial be, and is hereby, granted in the event the judgment for the defendants ordered above be set aside.
 
 
 50
 For reversal the plaintiff contends that it made a submissible case as to liability, that the district court did not err originally in admitting the testimony of plaintiff's expert witness, Jerry M. Bland, that the evidence justified an award of damages, and that the jury verdict of $600,000.00 was not excessive and did not manifest any bias or prejudice on the part of the jury.
 
 
 51
 Naturally, the defendants take issue with the plaintiff on all of those propositions and would have us uphold the judgment n. o. v. in their favor.[10]
 
 
 52
 The motions of the defendants for a directed verdict and their post-trial motion for judgment n. o. v. were based primarily on the contention that the plaintiff had failed to make a submissible case, that is to say that there was no substantial evidence to support a jury finding of a violation of § 1 of the Sherman Act or of damage proximately resulting from such a violation, if there was one.[11]
 
 
 53
 In passing upon a motion for judgment n. o. v. on the ground that there was no substantial evidence to sustain the verdict, a district court is required to apply the same standard that it applied to an original motion for a directed verdict, and the court of appeals is required to apply the same standard as that required of the district court. Such a motion must be denied unless the movant's case is so strong as to leave no room for reasonable difference of opinion. The evidence must be viewed in the light most favorable to the party opposing the motion, and that party is entitled to the benefit of all inferences favorable to him that reasonably may be drawn from the evidence. See, e. g., Singer Co. v. E. I. du Pont de Nemours & Co., 579 F.2d 433, 440-41 (8th Cir. 1978); Davis v. Burlington Northern, Inc., 541 F.2d 182, 186 (8th Cir.), Cert. denied, 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 613 (1976); Schneider v. Chrysler Motors Corp., 401 F.2d 549, 554 (8th Cir. 1968); See also the discussion in 9 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 2524.
 
 
 54
 We have given careful consideration to the record in this case, including the trial transcript. Aside from the question of whether plaintiff was damaged as a result of the action of World in filing and prosecuting its replevin suit and advising plaintiff that rates would be raised and that plaintiff would be required to keep its rental payments current, we are satisfied that there is simply no substantial evidence, direct or circumstantial, that the defendants or any two of them entered into any conspiracy to drive RFL out of business or to exclude it from the competitive leasing market for refrigerated trailers.
 
 
 55
 We think that the evidence, when viewed in the light most favorable to plaintiff and giving plaintiff the benefit of all favorable inferences, establishes no more than that when the top management of the Riss operation discovered the existing state of affairs, including the fact that RFL was indebted to World for about $50,000.00, management simply exercised a legitimate right to demand the payment of back rentals or the return of the equipment in plaintiff's possession, to advise plaintiff that in the future its rental rates would be raised, and to commence the replevin suit when plaintiff failed to either pay the back rentals or return the leased equipment. That the business failure of the plaintiff in 1971 was due to any action taken by the defendants in 1970 is in the highest degree speculative. In this connection we do not overlook the fact that after World repossessed its trailers, it refurbished them and then leased them to Riss, at least for a time. We do not think, however, that it can legitimately be inferred from that fact that the filing of the replevin suit was designed to make the eight trailers and three tractors in question available to Riss or that it improved the competitive position of Riss in any significant way.
 
 
 56
 The final judgment of the district court granting the defendants a judgment notwithstanding the verdict of the jury is affirmed. Hence, there is no occasion for us to consider the action of the district court in conditionally granting the defense motion for a new trial.
 
 
 57
 Affirmed.
 
 
 
 [1]
 Plaintiffs claimed originally that the defendants had violated not only § 1 of the Sherman Act but also § 2 of that Act, 15 U.S.C. § 2, and § 7 of the Clayton Act, 15 U.S.C. § 18. However, in the course of the proceedings in the district court the § 2 and § 7 claims were abandoned
 
 
 [2]
 In 1978 the Interstate Commerce Act was extensively revised. Act of October 13, 1978, P.L. 95-473, 92 Stat. 1337 Et seq., 49 U.S.C. 10101 Et seq., reprinted in, (1978) U.S.Code Cong. & Admin.News, 95th Cong., 2d Sess., 3009 Et seq
 
 
 [3]
 The suit was commenced by the corporation after it had been dissolved, and the defendants moved to dismiss the complaint on the ground that RFL had no capacity to sue. The district court sustained that contention but gave leave for an amendment of the complaint so that the trustees, the officers and directors of the corporation, could appear in the case as plaintiffs. An amended complaint was filed promptly in which pleading RFL was again named as a plaintiff but was joined by the dissolution trustees. Thus, the action was saved. We find it convenient henceforth in this opinion to refer to the plaintiffs collectively as "RFL" or as "plaintiff."
 
 
 [4]
 Generally unprocessed fresh fruits and vegetables, such as citrus fruits from Florida
 
 
 [5]
 According to the testimony of Mr. Riss, Republic not only owns Riss and World but also owns a housing development and a bank
 
 
 [6]
 It appears that the ICC issues three types of operating authority, namely: emergency temporary authority that is extremely short term; temporary authority that is valid for a longer period of time; and permanent authority. Most of the Riss applications were, at least originally, for emergency temporary authority
 
 
 [7]
 The controversies about authorities that were presented to the ICC at various levels were complicated, and no useful purpose would be served by undertaking to describe them in detail. Suffice it to say that they existed, and that RFL was involved in them
 
 
 [8]
 We note at this point that there was no appeal from the judgment of the Circuit Court, and the validity of that judgment is not questioned here. While that judgment is not res judicata with respect to the antitrust claims of the plaintiff, it is res judicata as to all issues that were or could have been presented properly to the state court in the replevin suit
 
 
 [9]
 In order for a plaintiff to recover damages under § 4 of the Clayton Act he must prove not only that there was a violation of the federal antitrust laws, but also that the violation damaged him in his business or property
 
 
 [10]
 Counsel for the defendants in their brief do not argue in support of the alternative ruling of the trial court that a new trial should be granted should the judgment n. o. v. be reversed by this court. However, we assume that the defendants would still want a new trial should the judgment n. o. v. be reversed
 
 
 [11]
 An alternative contention of the defendants was based on the "Noerr-Pennington" doctrine discussed by this court in detail in Mark Aero, Inc. v. Trans World Airlines, Inc., 580 F.2d 288 (8th Cir. 1978). We find it unnecessary to discuss that alternative contention